# EXHIBIT A

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GLASSWALL, LLC, a Florida
Corporation

        Plaintiff,

v.

AGC FLAT GLASS NORTH AMERICA, INC.
d/b/a AGC GLASS COMPANY NORTH
AMERICA, a Foreign Corporation, and
POMA GLASS & SPECIALTY WINDOWS, INC.,
a Foreign Corporation registered to do business in Florida.

        Defendants.

_____/

CIVIL DIVISION

CASE NO._____

## COMPLAINT

**COMES NOW**, the Plaintiff, GLASSWALL, LLC ("Plaintiff" or "Glasswall"), through

its undersigned counsel, hereby sues Defendants, AGC FLAT GLASS NORTH AMERICA, INC.,

d/b/a AGC GLASS COMPANY NORTH AMERICA ("Defendant" or "AGC"), and POMA

GLASS & SPECIALTY WINDOWS, INC. ("Defendant" or "Poma") ("AGC" and "Poma" are

collectively referred to herein as "Defendants"), and in support thereof alleges as follows:

## I.    NATURE OF ACTION

This matter arises from Defendants' failure to adequately supply glass products – known

as "glass lites" - to Glasswall, who was utilizing the lites to fabricate a curtainwall system for a

large-scale building development in New York. The production and delivery schedule of each

particular lite was carefully planned by Glasswall to ensure completion of the customized curtain-

wall system in accordance with the project's specifications. Defendants' failures, which were

largely caused by their misguided decision to utilize a new "start-up" factory that relied upon

untested technology and processes, resulted in Glasswall being unable to fabricate curtain wall modules necessary to maintain its original production schedule with the general contractor responsible for the New York development. Despite repeated promises by Defendants to remedy issues, this ongoing failure came at great expense to Glasswall, who was forced to delay and, at times, suspend fabrication of the curtain wall system pending receipt of acceptable glass from Defendants. Ultimately, due to Defendants' conduct, the general contractor leading the development terminated the contracts with Glasswall. And, as a result, Glasswall suffered extensive damages, which include, but are not limited to, increased manufacturing and labor costs, lost profits, and incurred other actual and contingent liabilities.

Because of a multitude of problems plaguing their glass lite production, Defendants failed to meet their contractual obligations with Glasswall. In addition, Defendants' misrepresentations concerning their production capabilities induced Glasswall to enter into and remain in the agreement with Defendants to its detriment. Through this action, Glasswall seeks to recover for the damages incurred because of Defendants' failure to adequately supply glass lite products.

## II.   THE PARTIES, JURISDICTION AND VENUE

1.      This is an action for damages in an amount greater than Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs, and attorneys' fees and is within the subject matter jurisdiction of this Court.

2.      Plaintiff, GLASSWALL, LLC, is a Florida limited liability company located at 1550 Biscayne Boulevard, Suite 300, Miami, Florida 33132. At all times relevant herein, its fabrication facility was located in Miami, Florida.

3.      Defendant, AGC FLAT GLASS NORTH AMERICA, INC., d/b/a AGC GLASS

2

COMPANY NORTH AMERICA is a corporation whose corporate headquarters are registered in the state of Georgia. Although not registered to do business in Florida, AGC carries on substantial and not isolated activity within Florida, maintaining a production facility in Jacksonville, Florida, (the address for which is identified on the Quotation, as later defined herein). As a result, the Defendant is subject to the jurisdiction of the Courts of this State.

4.      Defendant, POMA GLASS & SPECIALTY WINDOWS, INC. is a foreign corporation whose principal address is in the state of Ohio and is registered to do business in Florida. Additionally, Poma owned and operated a production facility in Jacksonville, Florida from which Defendants carried out a significant portion of the production that is the subject of Plaintiff's claims in the instant matter.

5.      Defendants have, and continue to, carry on significant business operations in the state of Florida. Further, Defendants' representatives and employees came to Miami-Dade, Florida for the purposes of performing under the subject agreements.

6.      At all times relevant herein, a substantial amount of Defendants' corporate activities were coordinated at its facility located at 6600 Suemac Place, Jacksonville, Florida. These activities included the preparation and dissemination of product quotations and the manufacturing of glass lites.

7.      During the course of its contractual relationship with Glasswall, multiple employees of Defendants conducted business at Plaintiff's Miami factory. Defendants directed multiple employees to routinely perform inspections of glass products to ensure conformance with contractual specifications.

8.      As such, venue in this action is proper in Miami-Dade County, Florida, which is

Jesse Dean-Kluger, P.A.
1110 Brickell Avenue Suite 208, Miami, Florida 33131 Phone: 305-534-3460 Fax: 786-206-3075

the location where the parties conducted business, where the Plaintiff suffered damages, and/or where the damages complained of herein occurred.

9.      Further, this Court has jurisdiction to hear this case.

### III.      GENERAL ALLEGATIONS

10.      Glasswall is a manufacturer of window wall and curtain wall systems used in high-rise commercial and residential buildings. Glasswall maintains a manufacturing facility in Miami, Florida.

11.      AGC is an affiliate of Asahi Glass Co. Ltd, a global glass manufacturer headquartered in Japan.

12.      AGC, whose United States headquarters are in Georgia, operates the company's domestic commercial fabrication glass business.

13.      Poma is a subsidiary of AGC whose principal address is in Ohio, and is registered to do business in the state of Florida. Poma contributes in operating AGC's commercial fabrication glass business. Poma carries on substantial, and not isolated, activity within the State of Florida.

14.      One of Defendants' main lines of business involves the sale of architectural glass products.

### THE HUNTERS POINT SOUTH PROJECT

15.      In 2012 Glasswall was contacted by Monadnock Construction Co., Inc. ("Monadnock") about fabricating a customized glass system for use on a project called Hunters Point South ("HPS").

16.      HPS is a waterfront mixed use development located along the East River in Long Island City, New York. The developer of HPS was a joint venture between the City of New York,

4

The Related Companies and Phipps Housing (the "Project"), and was the first phase of the largest affordable housing project in New York.

17.     The Project called for the construction of two residential towers (the "HPS Towers") for which Monadnock was the general contractor.

**CURTAIN WALLS**

18.     The HPS Towers incorporated a "curtain wall" system, which is an outer covering of a building that is oftentimes constructed with glass.[1]

19.     In need of manufacturer who could design and fabricate a customized curtain wall system for the Project, Monadnock entered negotiations with Glasswall.

20.     As a result, in two separate contracts dated January 3, 2013, Monadnock contracted with Glasswall to fabricate and deliver the curtain wall system for the HPS Towers (collectively, the "Monadnock Contract").  A copy of the Monadnock Contract has been attached hereto as **Exhibit "A."**

21.     Under the Monadnock Contract, Glasswall was responsible for fabricating curtain wall units at its Miami factory, and then shipping the units, which were then to be erected on-site at HPS.

22.     Fabrication of curtain wall units is done through a process called "glazing," through which Glasswall would receive glass lites, and then place the lites into frames that had already been pre-fabricated by Glasswall.

23.     Pursuant to the terms of the Monadnock Contracts, when the glazing process was completed, Glasswall would crate the curtain wall units, ship them, and Monadnock would erect

---

[1] A curtain wall is defined as a thin, usually aluminum-framed wall, containing in-fills of glass, metal panels, or thin stone. The framing is attached to the building structure and does not carry the floor or roof loads of the building.

Jesse Dean-Kluger, P.A.
1110 Brickell Avenue Suite 208, Miami, Florida 33131 Phone: 305-534-3460 Fax: 786-206-3075

the curtain wall system at HPS.

24.     Each frame comprising the curtain wall system for HPS was custom-designed and, as such, the glass lites utilized in glazing needed to meet the unique specifications of each curtain wall unit.   To this end, delivery by Defendants to Glasswall of particular "glass lites" was strategically scheduled to ensure that the curtain wall system could be fabricated per the Monadnock Contract requirements.

25.     Thus, failure of Defendants to timely deliver glass at the time agreed upon between Glasswall and Defendants would impede the fabrication of the entire curtain wall system at HPS. In other words, the efficient and unfettered fabrication of the curtain wall system was contingent upon Glasswall receiving glass that met its unique specifications in a timely manner.

**THE AGREEMENT WITH DEFENDANTS**

26.     In need of a supplier of glass for the Project, Glasswall inquired about Defendants' capability to deliver the glass required under the Monadnock Contracts, which notably specified that the all tempered glass be heat soaked.

27.     Pursuant to Glasswall's request, on February 8, 2013, Defendants delivered a Product Quotation originating from its Jacksonville facility to Glasswall establishing the terms under which Defendants promised to deliver the glass for the Project (the "Quotation"). A copy of the Quotation is attached hereto as **Exhibit "B."**

28.     Relying upon Defendants' representations that they had the capability to meet Glasswall's needs under the Monadnock Contracts, on June 17, 2013, Glasswall transmitted its purchase order number 12-7GW-015 (the "Glasswall Purchase Order"). A copy of the Glasswall Purchase Order is attached hereto as **Exhibit "C."**

6

29.     Glasswall's acceptance of the terms set forth in the Quotation through the transmittal of the Glasswall Purchase Order established a binding agreement between the parties (the "Glass Supply Agreement").

30.     Under the Glass Supply Agreement, Defendants agreed to supply the glass required for the Project for the sum amount of $2,393,196.98 and called for an approximately 6+ week lead time in delivering the glass.  Again, it also specified that heat-soaked tempered glass would be delivered.

**DEFENDANTS'S ATLANTA FACILITY**

31.     After receiving Glasswall's Purchase Order, Defendants announced the opening of a new fabrication facility near Atlanta, Georgia (the "Atlanta Facility").

32.     In press releases, Defendants referred to the Atlanta Facility as a "start-up," and represented that it was operating with "new software, new equipment and new processes." A copy of the Nov. 19, 2013 Article has been attached hereto as **"Exhibit D."**

33.     At no time leading up to Glasswall's transmittal of the Glasswall Purchase Order did Defendants disclose that any of the glass produced by Defendants under the Glass Supply Agreement would be manufactured at the experimental Atlanta Facility.

34.     Based upon information and belief, the manufacturing of glass that Defendants furnished to Glasswall for use at HPS began at the Atlanta Facility.

35.     Throughout Defendants' engagement with Glasswall, glass manufactured at the Atlanta Facility was non-conforming, poor quality, delivered late, and otherwise failed to comply with the specifications of the Glass Supply Agreement.

36.     Because of Defendants difficulty in producing the glass units under the Glass

7

Supply Agreement, Glasswall encountered serious impediments in the fabrication of the curtain wall units at its Miami facility, which, in turn, negatively impacted Glasswall's ability to supply/deliver the curtain wall units to HPS.

37.    In addition, after beginning its production of glass under the Glass Supply Agreement, due to the non-conforming products untimely delivered by the Atlanta Facility, Defendants made representations that at least some of the glass called for under the Glass Supply Agreement would be manufactured at Defendants' Jacksonville facility.

38.    Despite their representations to instill new measures to improve the quality of production at the Atlanta and Jacksonville Facilities, Defendants continued to manufacture non-conforming products which were delivered late.

39.    Due, in part at least, to these missteps, Defendants, through a Press Release dated December 30, 2014, decided to abandon operations at the Atlanta Facility and transfer the assets of the business on December 29, 2014, citing the business's underperformance and the need to "restore the profitability of the architectural glass business in the region." A copy of the Dec. 30, 2014 Press Release has been attached hereto as **Exhibit "E."**

**CURTAIN WALL FABRICATION**

40.    Glasswall's process to manufacture the curtain wall for the Projects involved: (1) pre-fabricating the frames in preparation to receive the glass, and (2) receipt of manufactured glass from Defendants for installation in the frames (glazing).

41.    The frames fabricated by Glasswall infabricating the curtain wall system were not uniform pieces, but were each specially designed to create a customized system exclusively designed for the Project.

8

42.     As such, each lite of glass that was produced and delivered by Defendants was uniquely designed to be paired with and glazed into specific frames comprising the curtain wall system.

43.     To ensure an efficient production process for the Project, when the customized frames were assembled and ready to be glazed, the fabricated glass from Defendants was expected to be present at the Glasswall facility and ready for installation.

44.     Ideally, once Glasswall received the specific glass product from Defendants, Glasswall would (1) shake out the glass lites and stage them for installation, (2) glaze the pre-fabricated frames, and (3) crate and ship the finished product to HPS for installation by Monadnock.

45.     Accordingly, if the glass from Defendants was either not timely delivered or not delivered in a production-ready manner or condition, per the agreed upon unit specifications, then Glasswall's production efficiency would be negatively impacted.  The frames assembled by Glasswall in anticipation of a release would either need to wait in their current location on the production floor, or need to be moved from the production floor to a holding area from which they could be brought back to the production floor when good glass was received from Defendants.[2]

46.     Because of the customized nature of the system, Defendants' failure to deliver the specified glass would result in the suspension in fabrication of the curtain wall system for HPS.

47.     As such, it was essential that Defendants deliver identifiable, installation-ready glass in the sequence agreed to by the parties.  Glasswall expended a significant amount of time and resources carefully planning and coordinating Project schedule requirements, its frame

---

[2] As detailed later herein, at times, Glasswall was forced to fabricate curtain wall units using plywood panels in place of glass lites prior to shipping the units to HPS. *See infra* ¶ 67.

9

assembly, and Defendants' glass delivery schedule.

48.     If any setbacks in this process occurred, Glasswall's production of curtain units would suffer.

49.     Even more, Glasswall would be forced to devote additional time and resources– in the form of increased labor and production costs – to compensate for Defendants' botched deliveries consisting of untimely deliveries, broken lites, and otherwise non-conforming product.

50.     Accordingly, Defendants' production and shipping obligations to Glasswall were explicitly defined in the purchase contracts and scheduled to meet Glasswall's production requirements.

51.     To meet its curtain wall production schedule for the Project, Glasswall expected and relied upon Defendants' ability to timely provide identifiable, installation-ready glass lites in the sequence agreed to by the parties.

**HPS PRODUCTION REQUIREMENTS**

52.     In planning its schedule of curtain wall production and delivery to the Project, Glasswall relied upon Defendants' representation of its glass production capabilities, inherent in the Quotation.  Notably, Defendants failed to disclose that they planned to produce glass units at the new untested Atlanta Facility.

53.     Defendants knew that Glasswall's curtain wall unit production plan for HPS was directly contingent upon Defendants' proper and timely performance of the terms contained in the Glass Supply Agreement – terms that Defendants knew or should have known that they could not meet using the "start-up" Atlanta Facility.[3]

---

[3] Before Glasswall could crate and ship a finished curtain wall to HPS, it must have received the glass lite from Defendants and fabricate the curtain wall at its Miami facility.

10

54.     Glasswall's ability to fabricate curtain wall units for the Project was directly dependent upon Glasswall receiving glass from Defendants that was: (a) timely, (b) properly fabricated, (c) identifiable and (d) intact.

**DEFENDANTS' PROBLEMS**

55.     From the outset Glasswall's production operation was significantly hindered due to a multitude of Defendants' deficiencies.

56.     Defendants' deficiencies include:

- inability to deliver heat-soaked glass;
- delivering broken glass;
- delivering defective glass;
- labeling problems;
- incorrect packing slips;
- PIB[4] problems with the glass lites;
- late deliveries;
- other quality issues.

57.     These failures directly resulted in Glasswall's inability to meet the planned delivery schedule for the Project, which, in turn, impacted fabrication of the units at Glasswall and on-site installation of the curtain wall system at HPS.

58.     Glasswall's ability to glaze and deliver the window units in a manner that could be coordinated with the on-site erection at HPS, as called for under the Monadnock Contracts, hinged on Defendants' ability to meet their obligations set forth under the Glass Supply Agreement.

59.     As a result of Defendants' inability to deliver the specified heat soaked glass, improper labeling, non-conforming product and late deliveries, Glasswall experienced delays in manufacturing and delivering curtain wall units for on-site installation, as well as an inability to

---

[4] Polyisobutylene, a glass sealant.

11

maintain a productive workflow.[5]

60.     Each time a defective or broken piece of glass was identified, Glasswall's performance and work productivity was impacted by additional handling of both the glass and the unit frames awaiting glazing, resulting in inefficiencies and increased costs to Glasswall's work.

61.     Since no one could tell when a defective or wrongly tagged lite would appear on the glazing line until it was unpacked and inspected, no dedicated force could effectively be assigned to this task, so that it had to be performed or assisted with by the people on the line, disrupting and delaying their regular work pattern.

62.     Further compounding the problem, each affected curtain wall unit had to be individually removed from the production floor to a storage area, tagged and inventoried for future retrieval when a proper lite was received.

63.     The emptied crate in which the glass was delivered by Defendants needed to be moved and in most cases re-used to house the glass in a separate storage area in case Defendants requested a return or a verification visit.  Glasswall then had to procure new glass for the frame waiting to be glazed, which meant further administrative work to order the replacement glass.

64.     When Defendants did eventually deliver an acceptable replacement, or when Glasswall managed to identify and properly re-tag a mis-tagged or mis-coded lite, Glasswall had to retrieve and forklift the corresponding frame back to the production line for glazing, necessarily disrupting the production line– driving down Glasswall's production efficiency and driving up its labor costs.

65.     Further hampering Glasswall's manufacturing efforts, a late-glazed unit often

---

[5] In order for Glasswall to effectively feed its production lines, it was critical that Defendants accompany the shipped product with accurate, consistent and reliable shipping information identifying what product was being shipped.

Jesse Dean-Kluger, P.A.
1110 Brickell Avenue Suite 208, Miami, Florida 33131 Phone: 305-534-3460 Fax: 786-206-3075

meant that it missed the scheduled release and shipment of the remaining units within any particular release, thereby requiring special tagging, shipping instructions, and site delivery instructions and handling. Again, Defendants' failed delivery further impacted Glasswall's labor and administrative costs.

66.     Without question, Defendants' deficiencies had a direct effect on Glasswall's assembly, glazing, shipping and receiving operations; in short, every aspect of Glasswall's ability to produce and timely complete its work.

67.     Further, in the absence of conforming glass and due to Defendants' errors, at times, Glasswall was forced to install plywood panels in lieu of glass in certain curtain wall units and ship the curtain wall unit without glass to HPS. After receiving the proper lites from Defendants, Glasswall would then have to ship the glass to the site for installation at HPS instead of installing it in the fabrication plant in Miami.

68.     As a result, Glasswall was forced to pay third-party contractors to conduct field glazing operations at the Project.

69.     Not only did Defendants' poor performance drive up Glasswall's costs in fabricating the HPS curtain wall system, but because of the botched glass deliveries, Glasswall's production of curtain wall units for the Project - which was originally estimated to be completed in March 2014 – was delayed through late October 2014.

**DEFENDANTS' ATLANTA FACILITY LEADS TO POOR PERFORMANCE**

70.     Defendants' use of its untested and unproven "start-up" Atlanta Facility was, in large part, responsible for Defendants' failure to meet its continuing obligations under the Glass Supply Agreement– a fact that is highlighted through Defendants' decision to abandon the facility

13

shortly after its opening.

71.     In fact, based upon information and belief, by the end of 2013, Glasswall encountered problems with over 1,000 units fabricated in Defendants' Atlanta Facility.

72.     As a result of Defendants' manufacturing and delivery deficiencies, a November 15, 2013 conference call and power point slide presentation was conducted, wherein Defendants acknowledged that remedial measures were necessary in order to improve the Defendants' performance (the "Presentation"). A copy of the Presentation is attached hereto as **Exhibit "F."**

73.     In the Presentation, Defendants' senior management not only stated that its performance was "below internal and industry standards," but also represented that it "[d]elayed shipments," "[h]ad a high reject rate," and "[h]ad low order completion." Exhibit F.

74.     The Presentation also outlined the implementation of certain measures to remedy Defendants' failure, including:   double inspection of all shipped lites; re-inspection of lites by Defendants' personnel at Glasswall's Miami facility; and production of lites at its Jacksonville, Florida factory utilizing proven technology and processes.

### DAMAGES INCURRED BY GLASSWALL DUE TO DEFENDANTS' FAILURES

75.     Ultimately, however, all reform efforts taken by Defendants were unsuccessful, as Defendants' delivery of glass continued to be plagued by the same issues well into 2014.

76.     Further the Defendants' employees that were placed at Glasswall's Miami factory to ameliorate Defendants' deficiencies were negligent in performing their responsibilities, and, otherwise, failed in their mission to improve Defendants overall performance under the Glass Supply Agreement.

77.     Because of the litany of problems involving Defendants' production of glass,

Jesse Dean-Kluger, P.A.
1110 Brickell Avenue Suite 208, Miami, Florida 33131 Phone: 305-534-3460 Fax: 786-206-3075

Glasswall's work was inefficient and delayed, resulting in increased operating and administrative costs.

78.     Moreover, Glasswall expended substantial labor during the months of November 2013, December 2013, and January 2014 sorting through received material and identifying and tagging Defendants' glass.  This not only increased Glasswall's labor costs, but the workforce necessary to perform this additional work further impacted Glasswall's productivity.

79.     Glasswall's fabrication relied upon and was based on commitments and representations by Defendants in providing installation ready glass, such that when Defendants' glass material arrived, the glass could be installed in the frames (glazed), the finished units packed (or crated), and then shipped to the Project.

80.     Upon entering into the Glass Supply Agreement, Defendants knew that Glasswall's ability to perform under the Monadnock Contract was contingent upon Defendants supplying the requisite lites according to the agreed upon schedule.

81.     This process did not happen.  While Glasswall's curtain wall frames were fabricated and ready to accept glass as planned, the glass that was to support production from Defendants was not available and Glasswall's frame assembly proceeded ahead of available material to finalize glazing.  In turn, Defendants' inability to deliver specific glass lite products negatively impacted Glasswall's ability to fabricate the entire curtain wall system in sequence and efficiently.

82.     Glasswall continued frame production as far as was practicable and made every effort to minimize lost time, in mitigation of its damages caused by Defendants.

83.     Glasswall employees were required to work thousands of hours of overtime in efforts to overcome Defendants' mistakes, making every attempt to maintain its schedule with

15

Monadnock.

84.     Ultimately, due to Defendants failure to deliver the contracted glass Monadnock terminated the Monadnock Contract with Glasswall.

85.     All told, the damages incurred by Glasswall include but are not limited to manufacturing costs, labor costs, liabilities created by Defendants' breaches, unabsorbed office overhead costs, legal fees, storage costs and consulting fees.

86.     Indeed, Glasswall suffered extensive damages and claims of damages in excess of $20,000,000.00 which as resulted in the failure of the Company.

87.     All conditions precedent to the maintenance of this action have occurred, have been performed, or have otherwise been waived or excused.

<u>**COUNT I — BREACH OF CONTRACT**</u>

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

88.     Glasswall and Defendants entered into the Glass Supply Agreement, wherein Defendants were obligated to supply glass lites to Glasswall for the production of curtain wall units per the specifications of the Project.

89.     Glasswall fully performed its obligations under the Glass Supply Agreement.

90.     Defendants breached the Glass Supply Agreement by failing to timely deliver glass to Glasswall that were in conformance with the specifications contained in the Glass Supply Agreement.

91.     Defendants' delivery of glass was replete with deficiencies, which included: incorrectly labeled glass, improperly packaged glass, non heat-soaked glass, broken and/or

16

scratched glass, incorrectly fabricated lites and glass lite units that were otherwise non-conforming.

92.     In addition, because of Defendants' breach, Monadnock terminated the Monadnock Contract.

93.     As a result of this breach, Glasswall has suffered damages

**WHEREFORE**, Plaintiff, GLASSWALL, LLC, demands judgment against Defendants, AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALTY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and further relief as this Court deems just and proper.

## COUNT II — FRAUD IN THE INDUCEMENT

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

94.     In early 2013, Defendants made misrepresentations about their ability to produce glass to Glasswall's specifications and timeline pursuant to its obligations under the Monadnock Contract.

95.     Defendants represented that they had the capability to produce heat-soaked tempered glass units, in the quantity Glasswall required under the Monadnock Contract, in a timely manner to allow Glasswall to meet its production schedule to fulfill its production requirements under the Monadnock Contract.

96.     Defendants misrepresentations are evidenced in the Quotation that outlined Defendants' glass lite production capabilities.

97.     At the time of this misrepresentation, Defendants knew or should have known that

17

they could not fulfill their obligations, as they were relying on a "start-up" factory that was utilizing unused technology and new processes.

98.     Defendants made these misrepresentations and, otherwise failed to disclose that they planned on utilizing an untested facility to meet their contractual obligations in producing glass in order to induce Glasswall into entering the Glass Supply Agreement.

99.     Based upon Defendants' misrepresentation, Glasswall entered into the Glass Supply Agreement.

100.    Because of Defendants' reliance on the untested Atlanta Facility in production, Defendants failed to timely deliver glass products pursuant to the terms of the Glass Supply Agreement and routinely delivered defective or nonconforming lites.

101.    As a result of Glasswall's reliance on Defendants' misrepresentations concerning their production capabilities, Monadnock terminated the Monadnock Contract and Glasswall suffered extensive damages.

**WHEREFORE**, Plaintiff, GLASSWALL, LLC, demands judgment against Defendants, AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALTY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and further relief as this Court deems just and proper.

## COUNT III— FRAUD IN THE PERFORMANCE

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

102.    Upon entering into the Glass Supply Agreement with Glasswall, Defendants were unable to timely deliver glass products conforming to the Agreement's specifications.

18

103.    In spite of its early failures, Defendants made ongoing representations that they would implement measures to improve Defendants' performance under the Glass Supply Agreement to meet their obligations.

104.    These representations include comments made by Defendants' management at the Presentation that Defendants had devised "actions to improve performance," which included "double inspection" prior to shipment, "re-inspect[ion] [of] [a]ll finished goods and "[n]ew [m]anagement structure & accountability."

105.    At the time of making these representations, Defendants lacked any plan to improve quality control or otherwise instill measures at the Atlanta Facility to ensure production of high quality, conforming glass.

106.    Rather, Defendants made these misrepresentations to induce Glasswall to continue to rely upon them as its manufacturer of glass lites.

107.    Based upon Defendants' ongoing representations to improve their production, Glasswall continued to rely on Defendants as its supplier of glass products rather than seeking an alternative vendor.

108.    Despite their representations otherwise, Defendants lacked any demonstrable measures to improve their performance, as they continued to supply glass that was not timely delivered, was of low quality and otherwise did not meet the specifications under the Glass Supply Agreement.

109.    As a result of Glasswall's reliance on Defendants' ongoing misrepresentations concerning their remedial measures, Glasswall suffered extensive damages.

**WHEREFORE**, Plaintiff, GLASSWALL, LLC, demands judgment against Defendants,

19

AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALITY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and further relief as this Court deems just and proper.

### COUNT IV– BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

110.   Glasswall and Defendants entered into the Glass Supply Agreement, under which Defendants were charged with supplying the glass that Glasswall intended to use to fabricate a curtain wall system for the residential towers at HPS.

111.   At the time of entering the Glass Supply Agreement, Defendants had knowledge that Glasswall was utilizing the glass products to glaze curtain wall units at its Miami factory and ultimately fabricate the curtain wall system on-site at HPS that comprised the curtain wall system for the HPS project.

112.   Defendants had an understanding of the manner in which the glass lites that they were supplying to Glasswall would be used.

113.   Defendants breached the implied warranty because the glass lites that were ultimately supplied to Glasswall suffered various defects, including scratched or broken glass, coating issues, incorrect fabrication and improper labeling, among others.

114.   As a result of the various defects, Glasswall suffered extensive damages.

**WHEREFORE**, Plaintiff, GLASSWALL, LLC, demands judgment against Defendants, AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALTY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and

20

further relief as this Court deems just and proper.

## RESERVATION OF RIGHTS

Plaintiff reserves the right to amend this Complaint to seek punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right by a jury.

Dated: March 21, 2017.

Respectfully submitted,

**JESSE DEAN-KLUGER, P.A.**
*Counsel for Plaintiff*
1110 Brickell Avenue, Suite 208
Miami, Florida 33131
Phone:  (305) 534-3460
Fax:  (786) 206-3075

By:  /s/ Jesse Dean-Kluger
     **JESSE DEAN-KLUGER**
     Fla. Bar No. 0062201

21

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GLASSWALL, LLC,                              )
                                             )
            Plaintiff,                       )
                                             )
v.                                           )          No. 3:17-CV-332-HSM-DCP
                                             )
AGC FLAT GLASS NORTH AMERICA, INC.,          )
and POMA GLASS & SPECIALITY WINDOWS,         )
INC.,                                        )
                                             )
            Defendants.                      )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court,

and Standing Order 13-02.

Now before the Court are the following Motions:

1. Defendants' Motion to Amend Scheduling Order and for Status
   Conference ("Motion to Amend") [Doc. 73];

2. Plaintiff's Motion for Extension of Time to Comply with Court
   Order ("Motion for Extension") [Doc. 74];

3. Defendants' Motion for Sanctions or, in the Alternative, to Compel
   ("Motion for Sanctions/Compel") [Doc. 79]; and

4. Defendants' Motion to File Under Seal Certain Documents Marked
   "Confidential" ("Motion to Seal") [Doc. 80].

The parties appeared before the Court for a motion hearing on October 19, 2018.  Attorneys

James Cinque and Jesse Dean-Kluger appeared via telephone, and Attorney W. Morris Kizer

appeared in-person on behalf of Plaintiff.   Attorney Richard Rose appeared on behalf of

Defendants.   Accordingly, for the reasons set forth below, the Court **GRANTS** [**Doc. 73**],

1

**DENIES AS MOOT** [**Doc. 74**], and **GRANTS IN PART AND DENIES IN PART** [**Docs. 79 and 80**].

## I.      BACKGROUND

Plaintiff is a Florida limited liability company engaged in the business of manufacturing window wall and curtain wall systems used in high-rise commercial and residential buildings. [Doc. 1-1 at ¶¶ 2, 10]. In 2012, Monadnock Construction Co., Inc. contracted with Plaintiff to fabricate curtain wall units at its Miami factory and deliver the units to New York for erection on-site during the construction of two residential towers ("the Project"). [*Id.* at ¶¶ 15, 17-19].[1]   In 2013, Plaintiff entered into an agreement with Defendants for the supply of the glass, known as "glass lites," for the Project. [*Id.* at ¶¶ 20-22]. Plaintiff alleges that Defendants failed to timely deliver the glass in conformance with the required specifications and timeline, misrepresented their abilities to perform their obligations, and breached an implied warranty of merchantability, all resulting in damages being suffered by Plaintiff. [*Id.* at ¶¶ 90, 94, 106, 113]. On March 21, 2017, Plaintiff sued Defendants in Miami-Dade County, Florida. Defendants then removed the case from state court to the Southern District of Florida in connection with the alleged breach of contract, and the case was subsequently transferred to this Court based on a venue clause in the agreement at issue. [Doc. 26].

Relevant to the pending Motions at issue are the ongoing disputes regarding damages discovery. Specifically, Plaintiff served its initial disclosures on June 23, 2017. [Doc. 62-4]. In its original initial disclosures, Plaintiff estimated that its damages may potentially exceed $35,000,000.00, but noted that the sum was calculated without the benefit of discovery or expert

---

[1] The Complaint also refers to the Project as Hunters Point South ("HPS"). [Doc. 1-1 at ¶ 15].

2

witness testimony.  Further, Plaintiff categorized its damages as follows: (1) legal fees incurred in defending against claims by related entities; (2) Plaintiff's total out-of-pocket expenditures to complete the HPS job in comparison to the projected costs had Defendants been able to deliver conforming product on time; (3) damages suffered by Plaintiff as a result of being forced out-of-business by the massive cost overruns connected with remedying Defendants' failure; and (4) the demand for damages by related companies in a New York arbitration, which Plaintiff calculated to be $17,362,977.45.  [Doc. 62-4].  On October 9, 2017, Defendants served discovery requests, which Plaintiff responded to on December 18, 2017.   Specifically, Plaintiff responded to Interrogatory No. 7 as follows:

> Interrogatory No. 7:
>
> Please fully itemize and explain your calculations in determining your total damages against Defendants, or any back charges, offsets or any other costs you contend are attributable to Defendants on the Project.
>
> Answer:
> Plaintiff has provided a full itemized cost report for this project with its Initial Disclosures.   Additionally, Plaintiff has incurred significant attorney's fees resulting from litigation arising from Defendants inability and failure to timely provide conforming product as per the parties' agreement and Defendants' misrepresentations as to their ability to perform under same. Further, as a result of Defendants' actions, Plaintiff is subject to a confirmed arbitration award in favor on Monadnock and continuing litigation with the bond company.

[Doc. 62-9 at 4].

Subsequently, on March 30, 2018, and upon Defendants' request, Plaintiff amended its initial disclosures.  [Doc. 62-7].   In its amended initial disclosures, Plaintiff estimated that its damages may potentially exceed $15,000,000.00.  [*Id.* at 5].  Plaintiff specified the following categories of damages: (1) legal fees incurred in defending against claims by Monadnock; (2)

Plaintiff's out-of-pocket expenditures to complete the HPS job in comparison to the projected costs had Defendants been able to deliver conforming product on time; (3) the arbitration award—Monadnock was awarded $1,499,255.19 in the New York arbitration; (4) interest on the arbitration award and pre-judgment interest on the other elements of damages claims; and (5) legal fees and damages which may be awarded against Plaintiff in a case in the Eastern District of New York. [*Id.*].

Later, on May 8, 2018, Defendants filed a motion to compel [Doc. 62], wherein they primarily argued that Plaintiff had not complied with its initial disclosure requirements pursuant to Federal Rule of Civil Procedure 26(a) and that Plaintiff had failed to produce ESI in accordance with the parties' agreed-upon search terms. Defendants asserted in their motion that the amended initial discloses lacked any specificity regarding the categories and quantities of Plaintiff's alleged damages and that they did not clearly reflect Plaintiff's agreement to remove other types of damages. With respect to out-of-pocket expenditures, Plaintiff stated in its response that it satisfied its obligation when it provided a 162-page expenditure report and that "the total amount of these expenditures exceed[] $18 million." [Doc. 63 at 3]. With respect to the ESI, Plaintiff represented that it would be produced by June 1, 2018.

The undersigned addressed Defendants' motion at a hearing on July 11, 2018. At the beginning of the hearing, Defendants stated that they had received Plaintiff's ESI documents on June 8, 2018, and therefore, that issue was moot. [Doc. 72 at 3-4]. Plaintiff did not dispute Defendants' statement. In addition, Plaintiff stated that it was not seeking out-of-business damages and clarified that it had removed such damages in its amended initial disclosures. [*Id.* at 33]. Further, during the hearing, and in the subsequent Memorandum and Order, the Court observed that Rule 26(a)(1)(A)(iii) requires that a party's initial disclosures include "a *computation* of each

4

category of damages claimed by the disclosing party." [Doc. 71 at 5] (quoting Rule 26(a)(1)(A)(iii)) (emphasis in [Doc. 71]). Plaintiff agreed to produce redacted invoices with respect to the legal fees incurred against it and the calculation of interest on the Monadnock Action. With respect to its out-of-pocket damages, Plaintiff maintained that it provided Defendants a budget that they could use to determine out-of-pocket damages by subtracting the numbers in the expenditure report from the numbers in the budget. Plaintiff stated that "all the overages were attributed to the [D]efendants." [Doc. 72 at 16]. Plaintiff agreed to produce that calculation to Defendants. Thus, in its Memorandum and Order [Doc. 71], the Court ordered as follows:

1. Plaintiff shall provide Defendants a copy of the attorney invoices, which Plaintiff may redact to protect attorney-client information, incurred in the Monadnock Action and incurred to date in the New York Action;

2. Plaintiff shall produce the interest calculation on the award in the Monadnock Action; and

3. Plaintiff shall provide Defendants with its calculation and any documents in support thereof with respect to out-of-pocket damages in accordance with its requirements under Rule 26(a)(1)(A)(iii).

The Court instructed Plaintiff to provide the above information within fourteen (14) days of entry of the Memorandum and Order (i.e., August 3, 2018). Further, while the Court determined that an award of attorney's fees was inappropriate at that juncture, the undersigned noted, "The Court, however, **ADMONISHES** Plaintiff that future discovery deficiencies that result in motion practice may warrant an award of attorney's fees." [Doc. 71 at 6] (emphasis in [Doc. 71]).

The instant Motions followed.

## II.     POSITIONS OF THE PARTIES

The Court will summarize the Motions in the order in which they were filed.

A.     **Defendants' Motion to Amend Scheduling Order and for Status Conference**

Pursuant to Federal Rule of Civil Procedure 16(b)(4), Defendants request [Doc. 73] that the Court (1) modify the scheduling order to allow Defendants sufficient time to conduct fact discovery and (2) hold a status conference to discuss discovery scheduling and other issues, particularly pertaining to discovery of Plaintiff's alleged damages and calculation thereof.  For grounds, Defendants outline the parties' issues with producing ESI.  Specifically, the parties were not able to produce the ESI by their agreed-upon date of April 20, 2018.  Defendants produced their ESI on May 8, 2018.  Plaintiff did not produce any ESI, which forced Defendants to file a motion to compel.  After the filing of Defendants' motion, Plaintiff produced 334,000 pages of documents and responded to Defendants' motion to compel by representing that it had substantially complied with the search protocol by producing 334,000 documents and that the remaining documents would be produced by June 1, 2018.  Defendants state that Plaintiff did not produce any additional documents on June 1, 2018, but at the hearing, the parties represented to the Court that Plaintiff had produced the ESI, and therefore, the issue was moot.  Defendants state that on July 19, 2018, Plaintiff produced an additional 2.2 million pages of documents.  Defendants submit that they need additional time to review such documents.  Further, Defendants argue that the scheduling of depositions has been difficult and that Plaintiff's failure to provide the necessary damages information has hampered Defendants' ability to move forward with discovery.

While Plaintiff does not oppose the request for an extension of the deadlines [Doc. 77], it argues that Defendants did not meet and confer on this issue.  Further, Plaintiff asserts that its counsel has provided dates for depositions.  With respect to meeting its discovery obligations pursuant to the Court's Memorandum and Order, Plaintiff maintains that as of the filing of its

6

Response (i.e., August 13, 2018), it "has fully complied with the requirements of the Order." [Doc. 77 at 5].

**B.**   **Plaintiff's Motion for Extension of Time to Comply with Court Order**

On August 2, 2018, Plaintiff filed a Motion [Doc. 74], requesting ten additional days (August 13, 2018) to comply with the Court's Order.  Defendants filed a Response [Doc. 75], objecting to the Motion.  In Plaintiff's Reply [Doc. 76], it asserts, "Although Plaintiff initially asked for 10 additional days, as of the date of this filing (seven days after the August 3, 2018 deadline), Plaintiff has completed full compliance by producing all documents required by Section II(A) of this Court's Order within the possession, custody, or control of Plaintiff." [Doc. 76 at 2].

**C.**   **Defendants' Motion for Sanctions or, in the Alternative, to Compel**

Defendants request [Doc. 79] that the Court sanction Plaintiff for failing to comply with the Court's Memorandum and Order.  Specifically, Defendants request the following sanctions: (1) that Plaintiff be prohibited from seeking or otherwise offering evidence to support damages other than the only damages Plaintiff was able to specifically identify during the Rule 30(b)(6) deposition ($2,592,806 set forth in a document known as the "Greyhawk Report"); (2) striking those portions of the Complaint that refer to any damages other than those set forth in the Greyhawk Report; (3) awarding Defendants all of their expenses, including, but not limited to, the attorney's fees they have expended chasing down the basic damages information compelled by the Federal Rules of Civil Procedure and this Court's Memorandum and Order, and wasting their time taking the Rule 30(b)(6) witness's deposition.

In the alternative, Defendants request that the Court order Plaintiff to (1) designate and produce a knowledgeable corporate representative for an additional seven-hour deposition in Chattanooga, Tennessee, on the topics noticed in Defendants' Rule 30(b)(6) notice of deposition;

7

(2) pay all Defendants' expenses, including, but not limited to, the attorney's fees associated with taking the Rule 30(b)(6) deposition, taking the second Rule 30(b)(6) deposition on the same topics, and all other attorney's fees Defendants have incurred trying to obtain the basic damages disclosures; (3) produce all documents requested in Defendants' second requests for production; (4) produce all iterations of the project budget upon which Plaintiff bases its damages; and (5) supplement Plaintiff's response to Defendants' Interrogatory No. 7.

For grounds, Defendants outline their attempts to compel Plaintiff to produce its damages calculations and submit how Plaintiff's calculations have been a fluctuating number. Defendants assert that on August 1, 2018, after the Court entered its Memorandum and Order, Plaintiff called Defendants and represented that the out-of-pocket damages were not the $6.5 million delta referenced at the hearing, but instead, the amounts reflected in the Greyhawk Report, which was never identified or discussed at the July 11 hearing. Defendants state that Plaintiff produced the Greyhawk Report but would not submit a calculation. Defendants sent a letter dated August 1, 2018, to Plaintiff that calculated the damages amount and requested confirmation of the said amount and to verify whether all documents had been produced to support Defendants' calculations. Defendants aver that, subsequently, Plaintiff filed its Motion for Extension [Doc. 74], representing that it had provided the first part of its out-of-pocket damages analysis but needed additional time to complete the document analysis in full compliance with the Court's Memorandum and Order. Defendants state that the following day, Plaintiff stated that it could not confirm the total damages claimed as set forth in Defendants' August 1 letter. Defendants maintain that despite Plaintiff representing to the Court that it had provided the first part of its damages calculation and that it needed more time to provide additional analysis, Plaintiff produced no other documents reflecting its out-of-pocket damages.

8

Further, Defendants assert that prior to the Rule 30(b)(6) deposition, they again attempted to obtain the calculation.  Plaintiff's counsel stated that the out-of-pocket damages is calculated by subtracting the cost value figure in the Hunters Point Original Budget from the total costs of page 162 of the expenditure report.  Defendants state that nine minutes later, Plaintiff's other counsel stated that the Greyhawk Report is not the sole basis for damages and that "the amended disclosures, Mr. Dean-Kluger's correspondence, and the documents attached to your deposition notice also provides a basis for an assessment of damages." [Doc 79-3 at 1].  Defendants maintain that Plaintiff has not provided the calculation.

In addition, Defendants argue that Plaintiff failed to prepare its corporate representative. Defendants state that Plaintiff designated Arthur Murphy ("Murphy") as its Rule 30(b)(6) witness. Defendants assert that Murphy testified that he did not review all of the documents attached to the deposition notice and that he was only able to specifically identify $2,592,806 in damages from the Greyhawk Report.  Defendants argue that under these circumstances, sanctions are warranted.

Plaintiff responds [Doc. 83] that it complied with the Court's previous Memorandum and Order by providing extremely voluminous discovery and making its Rule 30(b)(6) designee available for an entire day.  Plaintiff states that Murphy answered all questions posed to him. Plaintiff further argues that it identified five categories of damages.  Plaintiff states that with respect to the first category (i.e., legal fees), it provided a list of the legal fees and back-up documentation by way of redacted attorney's statements up to April 20, 2018.  Plaintiff states that the litigation is still pending and that it does not have an obligation to supplement on a daily basis. With respect to the second category of damages—that is, the out-of-pocket damages, Plaintiff states that these damages were documented by a comparison between the original budget and a list of Plaintiff's expenses.  Plaintiff states that Murphy was questioned about this amount and that he

9

testified the damages equal the difference between the amount on the original budget and the final expense report.  Plaintiff states that the difference is about $6.5 million.  Plaintiff asserts that approximately $2.6 million of this amount was detailed in the Greyhawk Report.  Plaintiff continues that the third category of damages is the amount of the award rendered by the arbitrators in the arbitration commenced by Monadnock and that a copy of the arbitration award was previously provided to Defendants.  With respect to the interest on that award, Plaintiff states that its counsel addressed the interest in the email dated August 1, 2018.  Finally, Plaintiff asserts that with the respect to the fifth category of damages (i.e., the legal fees and damages that may be awarded against Plaintiff in the Eastern District of New York), the action is still pending, and damages are being sought by the bonding company.  Thus, Plaintiff states that no damages have been awarded, so it cannot provide this information.

### D.      Defendants' Motion to File Under Seal Certain Documents Marked "Confidential"

Defendants request [Doc. 80] that the Court file under seal Exhibit F [Doc. 81] and Exhibit D [Doc. 82] to its Motion for Sanctions/Compel.  For grounds, Defendants explain that Exhibit F was designated as "confidential" by Plaintiff.  Further, Defendants state that Exhibit D contains portions of Plaintiff's Rule 30(b)(6) witness's testimony.  The sealed portion of the testimony references Exhibit D.  Defendants submit that they have filed a redacted version of Exhibit D.

Plaintiff filed a Response [Doc. 86], stating that Exhibit F is a settlement agreement with respect to certain claims in a pending matter in the United States District Court for the Eastern District of New York.  Plaintiff states that while the agreement settled some of the claims, there are other viable claims pending.  Plaintiff avers that the privacy rights of third parties to the New York action will be adversely affected if the document is disclosed.  Plaintiff also submits the

10

Declaration of James P. Cinque [Doc. 86-1] in support of its request to seal Exhibit F [Doc. 81].

Finally, Plaintiff states that Exhibit D [Doc. 82] may be publicly filed.

### III.    ANALYSIS

The Court has considered the parties' filings, the oral arguments, and the history of this case.  Accordingly, for the reasons more fully explained below, the Court **GRANTS** Defendants' Motion to Amend [**Doc. 73**], **DENIES AS MOOT** Plaintiff's Motion for Extension [**Doc. 74**], and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Sanctions/Compel [**Doc. 79**] and Defendants' Motion to File Under Seal [**Doc. 80**].

The Court will first address Defendants' Motion for Sanctions/Compel and then the Court will turn to the remaining issues in this case.

### A.    Defendants' Motion for Sanctions/Compel

As an initial matter, at the hearing, Plaintiff stated that the Florida litigation has concluded and that it is able to produce all attorney's invoices for that action.  With respect to the New York action, Plaintiff stated that the litigation is pending and that it did not want to send attorney's fees to Defendants on a monthly basis.  Defendants agreed that Plaintiff could provide the invoices reflecting the attorney's fees on a quarterly basis.  Further, the parties agreed that Plaintiff had produced the interest calculation on the arbitration award.  Thus, the remaining issues involve the out-of-pocket damages and the attorney's fees that Plaintiff alleges are attributable to Defendants' conduct.

The Court will first address whether Plaintiff has complied with its discovery obligations and then turn to Defendants' request for sanctions.

11

### 1.    Discovery Obligations

At the October 19 hearing, Defendants maintained that Plaintiff had not complied with its initial disclosure requirements under Rule 26(a) or the Court's Memorandum and Order. Defendants stated that Plaintiff produced a Greyhawk Report that explained approximately $2 million in damages but that Murphy testified that in order to calculate full damages, a complete analysis is needed.  Plaintiff insisted that it met its requirements under Rule 26(a) and the Court's Memorandum and Order.  Plaintiff stated that its damages calculation is $6.5 million and that Defendants' argument is to the sufficiency of establishing damages, as opposed to whether Plaintiff complied with its discovery obligations.

In considering the parties' arguments, the Court finds it helpful to review the requirements under Rule 26(a).

### (i)  Requirements Under Rule 26(a)

Rule 26 requires a party to provide the opposing party "a computation of each category of damages claimed" as well as "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.,* 596 F.3d 357, 366–67 (6th Cir. 2010) (quoting Fed. R. Civ. P. 26(a)(1)(A)(iii)).  Courts have explained that the "documentation and evidence required by Rule 26 must be sufficient to allow the opposing party to 'independently analyze' the claim." *Champion Foodservice, LLC v. Vista Food Exch., Inc.*, No. 1:13-CV-1195, 2016 WL 4468000, at *5 (N.D. Ohio Aug. 23, 2016) (citing *Bessemer*, 596 F.3d at 370) (summary nature of damages documentation provides insufficient data to analyze claim for lost profits and fails to satisfy Rule 26); *see also Scheel v. Harris*, No. 3:11-17-DCR, 2012 WL 3879279, at *4 (E.D. Ky. Sept. 6, 2012) (quoting *Bessemer*, 596 F.3d at 370); *Silicon Knights, Inc. v. Epic Games,*

12

*Inc.*, No. 5:07-CV-275-D, 2012 WL 1596722, at \*7 (E.D. N.C. May 7, 2012) (explaining that "Rule 26(a)(1)(A)(iii) and Rule 26(e) are designed to provide a damages computation and analysis during discovery" so that the "opposing party may then prepare to meet that evidence via cross examination and via evidence in its rebuttal case (such as its own expert witness).").

By way of illustration, in *Commonwealth Motorcycles, Inc. v. Ducati North America, Inc.*, the court found that plaintiff's estimated damages were insufficient under Rule 26(a)(1). No. 3:16-cv-00002, 2017 WL 3701192, at \*2 (E.D. Ky. Aug. 25, 2017). In *Commonwealth Motorcycles*, the plaintiff amended its Rule 26 disclosures to include four categories of damages, and each category provided an estimated amount of damages. *Id.* at \*1. The amended disclosure did not include any explanation as to how the numbers were estimated or any details on their calculation. *Id.* At one point during the litigation, the plaintiff took the position that it would have an exact number on a later date but that engaging in a more detailed analysis would be a particularly onerous task. *Id.* The plaintiff finally provided its damages in response to defendant's motion for summary judgment. *Id.* at \*2.

The defendant argued that summary judgment was appropriate because the plaintiff had not fully complied with its discovery calculation as required in Rule 26(a), which meant that the plaintiff could not prove its case. *Id.* at \*3. In reviewing the initial disclosure requirement, the court explained, "[F]ailure to investigate fully is not an excuse to fail to disclose." *Id.* (quoting *Big Lots Stores, Inc. v. Luv N' Care, Ltd.*, 302 F. App'x 423, 429-30 (6th Cir. 2008)). The court further noted, "A 'reasonable computation of damages is necessary to adequately plan and prepare for trial' and a [d]efendant should not be expected to go into a trial 'blind as to the damages claim of the plaintiff.'" *Id.* (quoting *Shoffner v. Qwest Commc'ns Corp.*, No. 4:01-CV-54, 2014 WL

3495045, at *11 (E.D. Tenn. June 23, 2014), *report and recommendation adopted*, 2014 WL 3495175 (E.D. Tenn. July 11, 2014)).

In determining whether the plaintiff should be sanctioned, the court observed the plaintiff had changed its damages calculation a number of times. *Id.* at *4. The court further noted that "despite multiple attempts by defendants to ascertain what, exactly, or close to exactly, the damages they were allegedly responsible for," plaintiff would not provide the calculation, despite it being "readily attainable." *Id.* In finding sanctions appropriate, the court reasoned, "Bringing a case against any defendant requires some amount of responsibility on the part of the [p]laintiff, the most basic of which is letting the [d]efendant know with as much certainty as possible the damages they are to dispute at trial so that the [d]efendant can develop a defense to all damages claimed." *Id.*

As demonstrated above, under Rule 26(a)(1)(A)(iii), a computation of each category of damages claimed is a mandatory initial disclosure, and a plaintiff is under a continuing obligation to supplement that disclosure "in a timely manner." Fed. R. Civ. P. 26(e)(1)(A) (stating that a disclosure under Rule 26(a) must be supplemented "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing"). Courts have explained that the "meaning of 'timely manner' varies with the facts and circumstances of each case, but courts generally take into account whether the supplementation occurred within thirty days of obtaining the information and whether the party supplemented the disclosure before discovery closed." *Riverfront Dev., Inc. v. Wepfer Marine, Inc.*, No. 216CV02553SHLCGC, 2018 WL 3043325, at *5 (W.D. Tenn. May 14, 2018) (citing *EEOC v. Dolgencorp, LLC*, 196 F. Supp. 3d 783, 795 (E.D. Tenn. 2016)). Further, "[f]ailure to

14

comply with a [Rule] 26(a) or (e) deadline results in a mandatory sanction under [Rule] 37(c), absent substantial justification or a showing of harmlessness." *Id.* (citing *Bessemer*, 596 F.3d at 370) ("[T]he test [under Rule 37(c)] is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless.") (citation and internal quotation marks omitted).

With the above guidance in mind, the undersigned will turn to the present issues.

**(ii)     Parties' Present Dispute**

As an initial matter, the Court observes that on August 16, 2018, Plaintiff had not provided Defendants with a computation of its out-of-pocket damages, despite its representation to the Court on August 10, 2018, that it was in full compliance with the Court's Memorandum and Order. *See* [Doc. 76] ("Plaintiff's Reply in Support of Motion for Extension") ("[A]s of the date of this filing, . . . Plaintiff has completed full compliance by producing all documents required by Section II(A) of this Court's Order within the possession, custody, or control of Plaintiff."). The Court specifically ordered Plaintiff to provide Defendants with its calculation *and* any documents in support thereof with respect to out-of-pocket damages in accordance with its requirements under Rule 26(a)(1)(A)(iii). On August 16, 2018, Defendants sent Plaintiff an email stating that they still do not have Plaintiff's calculation. [Doc. 79-2]. Instead of providing Defendants with a calculation, as ordered by the Court, Plaintiff responded with how the damages could be calculated. [*Id.*].[2] Nine minutes later, Plaintiff stated that the Greyhawk Report is not the sole basis for its damages and that the amended disclosures, correspondence attached from its counsel, and the documents attached to the deposition notice also provide a basis for the assessment of damages.

---

[2]     This issue was addressed at the July 11 hearing, wherein the Court specifically told Plaintiff that Rule 26 "does require a computation which would be a mathematical calculation." [Doc. 72 at 15].

15

[*Id.* at 79-3 at 1].  Plaintiff also stated that Defendants could question the witness and obtain more detailed information.  [*Id.*].  Thus, it appears that no calculation was provided by the Court's original deadline of August 3, 2018, or Plaintiff's requested deadline of August 13, 2018.

In any event, at the October 19 hearing, Plaintiff asserted that its out-of-pocket damages were $6.5 million and stated exhibits 2 and 3 support the calculation.  The Court has reviewed these documents, but the Court finds these documents provide insufficient data for Defendants to analyze Plaintiff's claim for out-of-pocket expenses.[3]  Thus, the undersigned agrees with Defendants that additional analysis is required.

For instance, as Defendants argued at the hearing, it is unclear what damages are specifically attributed to Defendants' alleged conduct.  *See Commonwealth Motorcycles*, 2017 WL 3701192, at *4 (plaintiff "continued to not actually calculate [its] damages despite multiple attempts by [d]efendants to ascertain what, exactly, or close to exactly, the damages they were allegedly responsible for").  Instead, Plaintiff relies on what it budgeted for the Project subtracted by the actual costs, but Plaintiff has not explained what damages are attributed to Defendants.  This insufficiency has essentially kept Defendants in the dark as to what further discovery needs to be completed because the individual line items need to be analyzed to calculate the damages attributed to Defendants.

At the hearing, Plaintiff acknowledged that its analysis is incomplete.  Plaintiff stated that its damages for out-of-pocket expenses are approximately $6.5 million, plus attorney's fees.  When

---

[3] It appears to the Court that the exhibits are actually 1 and 4.  [Doc. 79-1 at 5-6, 14-175]. Exhibit 1 [Doc. 79-1 at 5-6] is the Hunters Point South Budget, which provides a cost value for the Project as $11,959,803.00.  Exhibit 4 appears to be the 162-page expenditure report that Plaintiff previously referenced.  [Doc. 79-1 at 14-175].  This lists the total cost as $18,518,225.36. Using the formula provided by Plaintiff, $18,518,225.36 (costs) minus $11,959,803.00 (budget) equals $6,558,422.36.

16

asked about the $6.5 million, Plaintiff stated that the Greyhawk Report provided the analysis for approximately $2 million out of the $6.5 million.  Plaintiff acknowledged that as to the remaining amount, its analysis is incomplete.  Thus, as evidenced by the Greyhawk Report, the explanation for the remaining amount is readily attainable.  Plaintiff just has not, despite repeated requests, informally and formally, to provide the explanation.  At one point during the hearing, Plaintiff stated that it will "maybe" hire an expert to complete the analysis.  The Court reminded Plaintiff that its expert disclosures were currently due on November 6, 2018.  In any event, this was the first time that Plaintiff stated to the Court that it may need an expert to analyze its remaining, unexplained damages.  Plaintiff did not elaborate on why an expert was necessary and later stated that its former president, Mr. Anderson ("Anderson"), could testify as to the damages that Defendants allegedly caused.  *See Moore v. Weinstein Co., LLC*, No. 3:09-CV-166, 2011 WL 3348074, at *9 (M.D. Tenn. Aug. 3, 2011) (noting that the "court respects that [p]laintiffs may have to make use of expert testimony to calculate damages," but such experts have not been disclosed and that they "have yet to put forth any theory regarding how they intend to calculate their damages").

The Court observes that Defendants have requested this information numerous times via numerous methods.  For instance, in addition to the attempts outlined above, Defendants have also requested such information in its discovery requests (i.e., Interrogatory No. 7).  Specifically, Interrogatory No. 7 requests that Plaintiff fully itemize and explain its calculations with respect to its total damages.  Plaintiff simply responds that it has provided a full itemized cost report in its initial disclosures, it has incurred legal fees, an award from the Monadnock action, and it is engaged in continuing litigation with the bond company.  Plaintiff's response to Interrogatory No. 7 is wholly inadequate because Plaintiff does not provide any itemization or explanation for its

17

calculations as requested.[4]  Accordingly, the Court finds Plaintiff's response to Interrogatory No. 7 insufficient.

Finally, the Court notes that Defendants deposed Murphy, Plaintiff's designated Rule 30(b)(6) witness, in an attempt to elicit information with respect to damages that Plaintiff attributes to Defendants.  Defendants provided eleven topics in its notice of deposition, which included the specific damages sought with respect to each category of damages that were identified by Plaintiff. [Doc. 79-1 at 3-4].  Murphy was not able to testify to a number of specific topics in the notice, including questions involving damages.  For instance, Defendants questioned: "What portion of the $6,522,000 difference between Exhibit 3 and Exhibit Number 2 is not related to the defendants?" [Doc. 82 at 26].  Murphy testified, "Maybe some of the bond costs are not related to the defendants.  Maybe there are some costs in here that aren't.  But we—again, I'm sure there are some expenses in here, but as I said, the lion's share of items related to this have to do with the delays, the reworking, the issues we had." [*Id.* at 26-27].  In their Motion for Sanctions/Compel, Defendants have further laid out the deficiencies in Murphy's deposition. *See* [Doc. 79 at 13-14]. At the hearing, Plaintiffs conceded that Murphy was not able to answer everything but insisted that the former president, Anderson, would be able to answer questions.  Plaintiff, however, designated Murphy as the Rule 30(b)(6) witness, not Anderson.

It appears to the Court that Plaintiff's damages have essentially been a moving target.  On June 23, 2017, Plaintiff estimated that its damages exceeded $35,000,000.  On March 30, 2018,

---

[4] Defendants assert in their Motion for Sanctions/Compel that they requested Plaintiff supplement its response to Interrogatory No. 7 but that Plaintiff refused to supplement its response. [Doc. 79 at 9 n.4].  Defendants cite to a letter from Attorney Dean-Kluger, stating as follows, "Further, I do not agree with your efforts to add additional requirements not contained within the Order as contained in subsection (c) in the last paragraph of your letter."  While the Court did not specifically mention Interrogatory No. 7 in its previous Memorandum and Order, Plaintiff has an obligation to respond and supplement to discovery requests without the Court directing it to do so.

Plaintiff estimated that its damages may exceed $15,000,000.00.  When out-of-pocket damages became an issue, Plaintiff represented [Doc. 63] to the Court that its expenditures exceeded $18 million.  At the July 11 hearing, Plaintiff stated that with respect to its out-of-pocket damages, they provided a budget to determine such damages but did not provide a computation.  Finally, on October 19, Plaintiff represented that its out of-pocket damages were $6.5 million.  Plaintiff's Rule 30(b)(6) witness earlier testified, however, that Plaintiff is not attributing that entire amount to Defendants.  *See* [Doc. 79 at 13].  At the July 11 hearing, Plaintiff stated that it amended its initial disclosures to remove out-of-business damages.  [Doc. 72 at 33].  In Murphy's deposition, he discusses such damages and states that he does not know if Plaintiff is pursuing such damages.  *See* [Doc. 79 at 23].  In sum, Defendants have requested specificity as to the damages attributed to them, the Court has ordered a computation with the supporting documents, and Defendants have deposed a Rule 30(b)(6) witness that only provided testimony as to some of the damages and confusion as to others.

Accordingly, based on the above, the Court finds that Plaintiff did not comply with its initial disclosure requirements pursuant to Rule 26(a)(1)(A)(iii) or the undersigned's Memorandum and Order directing it to provide a computation with the supporting documents by August 3, 2018, nor did it comply by the requested extension of August 13, 2018.  The Court finds Plaintiff's reliance upon the formula (budget minus expense) insufficient as demonstrated by Murphy's deposition and the exhibits thereto.  Further, the Court finds Plaintiff's response to Interrogatory No. 7, and its refusal to supplement, improper.

Now that the Court has determined Plaintiff has not complied with its discovery obligations, the Court will determine whether sanctions are appropriate.

19

## 2.      Sanctions

As outlined in section II(C), *supra*, Defendants request that the Court sanction Plaintiff for failing to comply with the Court's Memorandum and Order.  Specifically, Defendants request the following sanctions: (1) that Plaintiff be prohibited from seeking or otherwise offering evidence to support damages other than the only damages Plaintiff was able to specifically identify during the Rule 30(b)(6) deposition ($2,592,806 set forth in a document known as the "Greyhawk Report"); (2) striking those portions of the Complaint that refer to any damages other than those set forth in the Greyhawk Report; (3) awarding Defendants all of their expenses, including, but not limited to, the attorney's fees they have expended chasing down the basic damages information compelled by the Federal Rules of Civil Procedure and this Court's Order, and wasting their time taking the Rule 30(b)(6) witness's deposition.

In the alternative, Defendants request that the Court order Plaintiff to (1) designate and produce a knowledgeable corporate representative for an additional seven-hour deposition in Chattanooga, Tennessee, on the topics noticed in Defendants' Rule 30(b)(6) notice of deposition; (2) pay all Defendants' expenses, including, but not limited to, the attorney's fees associated with taking the Rule 30(b)(6) deposition, taking the second Rule 30(b)(6) deposition on the same topics, and all other attorney's fees Defendants have incurred trying to obtain the basic damages disclosures; (3) produce all documents requested in Defendants' second requests for production; (4) produce all iterations of the project budget upon which Plaintiff bases its damages; and (5) supplement Plaintiff's response to Defendants' Interrogatory No. 7.

Federal Rule of Civil Procedure 37 governs the use of sanctions with respect to discovery failures.  Rule 37(b)(2) provides as follows:

> **(A)** *For Not Obeying a Discovery Order*. If a party or a party's officer, director, or managing agent--or a witness designated

20

under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i)  directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)  prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)  striking pleadings in whole or in part;

(iv)  staying further proceedings until the order is obeyed;

(v)  dismissing the action or proceeding in whole or in part;

(vi)  rendering a default judgment against the disobedient party; or

(vii)  treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).  The Rule also provides as follows:

*(C) Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2)(C).

Sanctions are also available under Rule 37(c) for failing to disclose or supplement.  Rule 26(e) requires a party to supplement its disclosure and other discovery responses "in a timely manner," *see* Fed. R. Civ. P. 26(e), and the failure to comply with Rule 26(a) or (e) may result in imposition of sanctions pursuant to Rule 37(c)(1) unless the violation was harmless or substantially justified.  Fed. R. Civ. P. 37(c)(1).

21

In determining whether sanctions are appropriate pursuant to Rule 37, the Sixth Circuit has utilized four factors. *Freeland v. Amigo*, 103 F.3d 1271, 1277 (6th Cir. 1997). Specifically, the Sixth Circuit has explained as follows:

> The first factor is whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; the second factor is whether the adversary was prejudiced by the party's failure to cooperate in discovery; the third factor is whether the party was warned that failure to cooperate could lead to the sanction; and the fourth factor in regard to a dismissal is whether less drastic sanctions were first imposed or considered.

*Id.* "A court is vested with wide discretion in determining an appropriate sanction under Rule 37." *Little Hocking Water Assn., Inc. v. E.I. du Pont de Nemours & Co.*, 94 F. Supp. 3d 893, 902 (S.D. Ohio 2015).

The Court has carefully considered and weighed all four factors. While the Court finds some sanctions are appropriate, the Court does not find that Defendants' requested sanctions are appropriate at this time. The Court has considered the first factor—that is, whether Plaintiff was willful, acted in bad faith, or was at fault. The Court finds that Plaintiff was at fault for the violations. At the July 11 hearing, the Court made it clear to Plaintiff that it was required to provide a computation and that its initial disclosures were inadequate. Plaintiff did not provide a computation, even after it represented to the Court that it was in full compliance with the Memorandum and Order. Further, Plaintiff did not provide a Rule (30)(b)(6) witness that was able to address the subject matters that were noticed. Plaintiff conceded that Murphy could not answer the questions relating to damages.

Second, the Court has also considered whether Defendants have been prejudiced by Plaintiff's failure to cooperate in discovery. The Court finds that Defendants have been prejudiced due the impending deadlines in this case, but as further explained below, the Court will extend

22

certain deadlines, as Defendants have requested, making Plaintiff's noncompliance less prejudicial. Further, the Court admonished Plaintiff in the previous Memorandum and Order that "future discovery deficiencies that result in motion practice may warrant an award of attorney's fees." [Doc. 71 at 6].

Finally, the Court has considered whether less drastic sanctions were first imposed or considered. The Court considered an award of attorney's fees at the previous hearing but declined to award them. The Court finds that it is appropriate to award attorney's fees at this juncture because Plaintiff's noncompliance with its discovery obligations has cost Defendants' time and resources and has hampered their ability to move forward with discovery. The Court finds that Defendants **SHALL** be awarded their reasonable attorney's fees in preparing and litigating their Motion for Sanctions/Compel and that Defendants **SHALL** be awarded half their attorney's fees associated with taking Murphy's deposition. The Court will award half of the attorney's fees for Murphy's deposition because Murphy was able to provide some helpful information. The Court declines to award attorney's fees for Anderson's deposition at this time because it is unclear how helpful his deposition will be, and the Court has already awarded half of the attorney's fees for Murphy's deposition.

Defendants shall submit their attorney's fees to Plaintiff within fourteen (14) days of entry of this Memorandum and Order. If the parties dispute the reasonableness of Defendants' attorney's fees, they may bring the matter to the attention of the Court.

The Court has specifically considered Defendants' request to prohibit Plaintiff from offering evidence of its full amount of alleged damages and/or striking the pleadings that refer to any damages other than those set forth in the Greyhawk Report. While Rule 37(b)(2) allows such sanctions, the Court finds these proposals too drastic at this time. Instead, the Court prefers that

the parties proceed with their discovery obligations and that this case, including the issue of damages, be considered and tried on the merits. The Court **ADMONISHES** Plaintiff that future discovery abuses of similar magnitude could warrant the more drastic sanctions described in Rule 37(b)(2).

### B.      Defendants' Motion to Amend and Plaintiff's Motion for Extension

Defendants request [Doc. 73] that the Court modify the Scheduling Order to allow them sufficient time to conduct fact discovery. Defendants also request a status conference, which the Court granted by setting the hearing on October 19, 2018. As mentioned above, Plaintiff requested until August 10, 2018, to comply with the Court's previous Memorandum and Order, but as explained above, the Court has already determined that Plaintiff was not in compliance.

Given the issues discussed above, the Court finds it appropriate to modify the Scheduling Order in this case. Accordingly, the Scheduling Order and other deadlines are amended as follows:

1. Plaintiff shall complete its damages analysis, including supplementing its response to Interrogatory No. 7; producing documents relating to out-of-business damages, if Plaintiff is claiming such damages; and any legal fees that have yet not been explained; on or before **November 16, 2018**. If an expert is necessary for additional analysis, Plaintiff shall submit its expert disclosures on or before **December 6, 2018**. If Anderson, or other Rule 30(b)(6) witnesses, can provide testimony as to damages, the parties **SHALL** work together to schedule such deposition(s) by agreement prior to **December 31, 2018**;

2. Defendants shall submit their expert disclosures on or before **January 31, 2019**;

3. Final witness lists shall be due by **February 15, 2019**; and

4. All discovery shall be completed by **February 29, 2019**.

Accordingly, the Court finds Defendants' Motion to Amend [**Doc. 73**] is **GRANTED**, and Plaintiff's Motion for Extension [**Doc. 74**] is **DENIED AS MOOT**.

24

C.      **Defendants' Motion to Seal**

Defendants have requested [Doc. 80] that Exhibit F [Doc. 81] and Exhibit D [Doc. 82] be filed under seal due to Plaintiff's "confidentiality" designations.  Plaintiff filed a Response [Doc. 86], explaining that Exhibit F is a confidential settlement agreement in a case pending in the Eastern District of New York and that the settlement agreement involves parties that are not part of this case.  Further, Plaintiff states that the settlement agreement does not dispose of all claims in the New York action.  The Court finds Plaintiff has established good cause for filing [Doc. 81] under seal.  Further, Plaintiff states that [Doc. 82] may be publicly filed.  Accordingly, Defendants' Motion to File Under Seal [**Doc. 80**] is **GRANTED IN PART AND DENIED IN PART**.  The Clerk is **DIRECTED** to place [Doc. 81] under seal.  Further, based on Plaintiff's representation, the Court is **DIRECTED** to unseal [Doc. 82].

IV.     **CONCLUSION**

Accordingly, for the reasons set forth above, the Court finds as follows:

1.  Defendants' Motion to Amend Scheduling Order and for Status Conference [**Doc. 73**] is **GRANTED**;

2.  Plaintiff's Motion for Extension of Time to Comply with Court Order is **DENIED AS MOOT** [**Doc. 74**];

3.  Defendants' Motion for Sanctions or, in the Alternative, to Compel [**Doc. 79**] is **GRANTED IN PART AND DENIED IN PART**; and

4.  Defendants' Motion to File Under Seal Certain Documents Marked "Confidential" [**Doc. 80**] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

ENTER:

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge

25

# EXHIBIT C

AO 88  (Rev. 02/14)  Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Tennessee

| | |
|---|---|
| GLASSWALL, LLC | ) |
| *Plaintiff* | ) |
| v. | ) |
| AGC FLAT GLASS NORTH AMERICA, INC., et al. | ) |
| *Defendant* | ) |

Civil Action No.   3:17-CV-332-HSM-DCP

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A CIVIL ACTION

To: ████████████████████████████████████████████

*(Name of person to whom this subpoena is directed)*

    **YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place set forth below to testify at a hearing or trial in this civil action.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| | | |
|---|---|---|
| Place:  Miller & Martin PLLC<br>832 Georgia Avenue, Ste. 1200<br>Chattanooga, TN 37402 | Courtroom No.: | |
| | Date and Time: 10/04/2018 9:00 am | |

    You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:  See Exhibit A.

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  09/19/2018

      *CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  **Defendants**
_____ , who issues or requests this subpoena, are:

Richard C. Rose, Miller & Martin PLLC, (423) 785-8268, richard.rose@millermartin.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88 (Rev. 02/14) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 2)

Civil Action No. 3:17-CV-332-HSM-DCP

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

◻ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

◻ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88  (Rev. 02/14)  Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).



**EXHIBIT A**

Defendants, by and through their attorneys Miller & Martin PLLC, hereby request that you produce the following documents described below prior to or at the time and place specified in the Subpoena.

**<u>Definitions</u>**

Unless otherwise specifically defined, each term used herein shall have the meaning assigned to such term below. Furthermore, whenever appropriate, the singular form of a word should be interpreted in the plural, and similarly the plural form should be interpreted in the singular.

A. "Person" means a natural person or corporation, partnership, or other business entity.

B. "Glasswall" means the Plaintiff in this action, Glasswall, LLC, and its employees and agents.

C. "AGC" means Defendant AGC Flat Glass North America, Inc.

D. "POMA" means Defendant POMA Glass & Specialty Windows, Inc.

E. "Project" refers to the Hunters Point South Project in Long Island City, New York, as referenced in the complaint filed in this action attached hereto as Exhibit 1.

F. The term "Settlement Agreement" refers to the agreement executed on or about July 17, 2018, attached hereto as Exhibit 2.

G. The term "Assignment" refers to the Assignment of Judgment and Claims attached to the Settlement Agreement as Exhibit A.

H. The term "documents" refers to documents, electronically stored information (ESI), and tangible things and shall be interpreted as broadly and comprehensively as permitted by the Federal Rules of Civil Procedure, to include drafts, originals, and any non-identical copies, regardless of whether existing in hard print or as ESI. ESI includes any type of

information that is stored electronically, including that described in Rule 34 of the Federal Rules of Civil Procedure.

I. The phrases "relate to," "related to," and "relating to" include and are to be interpreted as meaning: pertaining to, recording, evidencing, constituting, containing information about, setting forth, reflecting, showing, disclosing, describing, discussing, analyzing, explaining, summarizing, concerning or referring to, whether directly or indirectly, whether in whole or in part.

J. The words "and," "and/or," and "or" shall each be deemed to refer to both their conjunctive and disjunctive meanings, so as to include any information within the scope of any of the requests in which it is contained. The words "each" and "any" shall mean "each and every" as well as "any one."

K. Unless otherwise specifically stated, these requests relate to the time period January 1, 2013 through the present.

## Documents Requested

1. Any and all documents related to the formation of ▮▮▮▮▮▮▮, including, but not limited to, operating agreements, bylaws, authorization forms, organizational charts, and communications discussing the formation of the entity. Any and all documents identifying the members of ▮▮▮▮▮▮▮. To the extent any member is a corporation or limited liability company, please identify the members of such entity or entities.

2. Any and all documents related to the identity of any lawyers who created the formation documents for ▮▮▮▮▮▮▮.

3. Any and all documents evidencing communications between ▮▮▮▮▮▮▮ and any other party to the Settlement Agreement.

4. Any and all documents, other than the Settlement Agreement, evidencing agreements between ▮▮▮▮▮▮▮ and any other party to the Settlement Agreement.

5. Any and all documents, other than the Settlement Agreement, evidencing agreements between ▮▮▮▮▮▮▮ and any other party.

6. Any and all documents identifying the person or persons who paid the formation fees, taxes, filing fees, or any other fees of ███████████.

7. Any and all document evidencing and relating to monetary transfers by and between ████ ██████████ on the one hand, and one or more parties to the Settlement Agreement, on the other.

8. Any and all document evidencing and relating to monetary transfers by ██████████, on the one hand, and any one or more individuals or entities, on the other:

Jason B. Giller;
James P. Cinque;
Jesse Dean-Kluger;
Clinton B. Flagg;
W. Morris Kizer;
Jason B. Giller, P.A.;
Cinque & Cinque, P.C.;
Jesse Dean-Kluger, PA;
Clinton B. Flagg, P.A.;
Gentry, Tipton & McLemore, P.C.;
Crabtree & Associates, P.A.;
Schiff Hardin LLP;
Thacher Associates, LLC;
Arent Fox LLP; and
Robert Wane Pearce, PA.
Ugo Columbo

9. Any and all documents, whether internally at ████████████ or with a third-party, discussing the Settlement Agreement.

10. Any and all documents, whether internally at ████████████ or with a third-party, discussing the Assignment.

11. Any and all documents evidencing ████████████s intent to pursue, assign, transfer, or otherwise dispose of the judgment referenced in the Assignment.

12. Any and all documents by and between ████████████, one the one hand, and any one or more individuals or entities, on the other:

Jason B. Giller;
James P. Cinque;
Jesse Dean-Kluger;
Clinton B. Flagg;
W. Morris Kizer;
Jason B. Giller, P.A.;
Cinque & Cinque, P.C.;
Jesse Dean-Kluger, PA;
Clinton B. Flagg, P.A.;

Gentry, Tipton & McLemore, P.C.;
Crabtree & Associates, P.A.;
Schiff Hardin LLP;
Thacher Associates, LLC;
Arent Fox LLP; and
Robert Wane Pearce, PA.
Ugo Columbo

13. Any and all documents evidencing ███████████ s communications with Westchester
Fire Insurance Company.

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GLASSWALL, LLC, a Florida
Corporation

        CIVIL DIVISION

        Plaintiff,

        CASE NO._____

v.

AGC FLAT GLASS NORTH AMERICA, INC.
d/b/a AGC GLASS COMPANY NORTH
AMERICA, a Foreign Corporation, and
POMA GLASS & SPECIALTY WINDOWS, INC.,
a Foreign Corporation registered to do business in Florida.

        Defendants.

_____/

## COMPLAINT

**COMES NOW**, the Plaintiff, GLASSWALL, LLC ("Plaintiff" or "Glasswall"), through

its undersigned counsel, hereby sues Defendants, AGC FLAT GLASS NORTH AMERICA, INC.,

d/b/a AGC GLASS COMPANY NORTH AMERICA ("Defendant" or "AGC"), and POMA

GLASS & SPECIALTY WINDOWS, INC. ("Defendant" or "Poma") ("AGC" and "Poma" are

collectively referred to herein as "Defendants"), and in support thereof alleges as follows:

### I.  NATURE OF ACTION

This matter arises from Defendants' failure to adequately supply glass products – known

as "glass lites" - to Glasswall, who was utilizing the lites to fabricate a curtainwall system for a

large-scale building development in New York.  The production and delivery schedule of each

particular lite was carefully planned by Glasswall to ensure completion of the customized curtain-

wall system in accordance with the project's specifications.  Defendants' failures, which were

largely caused by their misguided decision to utilize a new "start-up" factory that relied upon

**EXHIBIT 1**

untested technology and processes, resulted in Glasswall being unable to fabricate curtain wall modules necessary to maintain its original production schedule with the general contractor responsible for the New York development. Despite repeated promises by Defendants to remedy issues, this ongoing failure came at great expense to Glasswall, who was forced to delay and, at times, suspend fabrication of the curtain wall system pending receipt of acceptable glass from Defendants. Ultimately, due to Defendants' conduct, the general contractor leading the development terminated the contracts with Glasswall. And, as a result, Glasswall suffered extensive damages, which include, but are not limited to, increased manufacturing and labor costs, lost profits, and incurred other actual and contingent liabilities.

Because of a multitude of problems plaguing their glass lite production, Defendants failed to meet their contractual obligations with Glasswall. In addition, Defendants' misrepresentations concerning their production capabilities induced Glasswall to enter into and remain in the agreement with Defendants to its detriment. Through this action, Glasswall seeks to recover for the damages incurred because of Defendants' failure to adequately supply glass lite products.

## II.   THE PARTIES, JURISDICTION AND VENUE

1.      This is an action for damages in an amount greater than Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs, and attorneys' fees and is within the subject matter jurisdiction of this Court.

2.      Plaintiff, GLASSWALL, LLC, is a Florida limited liability company located at 1550 Biscayne Boulevard, Suite 300, Miami, Florida 33132. At all times relevant herein, its fabrication facility was located in Miami, Florida.

3.      Defendant, AGC FLAT GLASS NORTH AMERICA, INC., d/b/a AGC GLASS

2

COMPANY NORTH AMERICA is a corporation whose corporate headquarters are registered in the state of Georgia. Although not registered to do business in Florida, AGC carries on substantial and not isolated activity within Florida, maintaining a production facility in Jacksonville, Florida, (the address for which is identified on the Quotation, as later defined herein). As a result, the Defendant is subject to the jurisdiction of the Courts of this State.

4.      Defendant, POMA GLASS & SPECIALTY WINDOWS, INC. is a foreign corporation whose principal address is in the state of Ohio and is registered to do business in Florida. Additionally, Poma owned and operated a production facility in Jacksonville, Florida from which Defendants carried out a significant portion of the production that is the subject of Plaintiff's claims in the instant matter.

5.      Defendants have, and continue to, carry on significant business operations in the state of Florida. Further, Defendants' representatives and employees came to Miami-Dade, Florida for the purposes of performing under the subject agreements.

6.      At all times relevant herein, a substantial amount of Defendants' corporate activities were coordinated at its facility located at 6600 Suemac Place, Jacksonville, Florida. These activities included the preparation and dissemination of product quotations and the manufacturing of glass lites.

7.      During the course of its contractual relationship with Glasswall, multiple employees of Defendants conducted business at Plaintiff's Miami factory. Defendants directed multiple employees to routinely perform inspections of glass products to ensure conformance with contractual specifications.

8.      As such, venue in this action is proper in Miami-Dade County, Florida, which is

3

the location where the parties conducted business, where the Plaintiff suffered damages, and/or where the damages complained of herein occurred.

9.      Further, this Court has jurisdiction to hear this case.

### III.   GENERAL ALLEGATIONS

10.     Glasswall is a manufacturer of window wall and curtain wall systems used in high-rise commercial and residential buildings. Glasswall maintains a manufacturing facility in Miami, Florida.

11.     AGC is an affiliate of Asahi Glass Co. Ltd, a global glass manufacturer headquartered in Japan.

12.     AGC, whose United States headquarters are in Georgia, operates the company's domestic commercial fabrication glass business.

13.     Poma is a subsidiary of AGC whose principal address is in Ohio, and is registered to do business in the state of Florida. Poma contributes in operating AGC's commercial fabrication glass business. Poma carries on substantial, and not isolated, activity within the State of Florida.

14.     One of Defendants' main lines of business involves the sale of architectural glass products.

### THE HUNTERS POINT SOUTH PROJECT

15.     In 2012 Glasswall was contacted by Monadnock Construction Co., Inc. ("Monadnock") about fabricating a customized glass system for use on a project called Hunters Point South ("HPS").

16.     HPS is a waterfront mixed use development located along the East River in Long Island City, New York. The developer of HPS was a joint venture between the City of New York,

4

The Related Companies and Phipps Housing (the "Project"), and was the first phase of the largest affordable housing project in New York.

17.     The Project called for the construction of two residential towers (the "HPS Towers") for which Monadnock was the general contractor.

**CURTAIN WALLS**

18.     The HPS Towers incorporated a "curtain wall" system, which is an outer covering of a building that is oftentimes constructed with glass.[1]

19.     In need of manufacturer who could design and fabricate a customized curtain wall system for the Project, Monadnock entered negotiations with Glasswall.

20.     As a result, in two separate contracts dated January 3, 2013, Monadnock contracted with Glasswall to fabricate and deliver the curtain wall system for the HPS Towers (collectively, the "Monadnock Contract"). A copy of the Monadnock Contract has been attached hereto as **Exhibit "A."**

21.     Under the Monadnock Contract, Glasswall was responsible for fabricating curtain wall units at its Miami factory, and then shipping the units, which were then to be erected on-site at HPS.

22.     Fabrication of curtain wall units is done through a process called "glazing," through which Glasswall would receive glass lites, and then place the lites into frames that had already been pre-fabricated by Glasswall.

23.     Pursuant to the terms of the Monadnock Contracts, when the glazing process was completed, Glasswall would crate the curtain wall units, ship them, and Monadnock would erect

---

[1] A curtain wall is defined as a thin, usually aluminum-framed wall, containing in-fills of glass, metal panels, or thin stone. The framing is attached to the building structure and does not carry the floor or roof loads of the building.

Jesse Dean-Kluger, P.A.
1110 Brickell Avenue Suite 208, Miami, Florida 33131 Phone: 305-534-3460 Fax: 786-206-3075

the curtain wall system at HPS.

24.     Each frame comprising the curtain wall system for HPS was custom-designed and, as such, the glass lites utilized in glazing needed to meet the unique specifications of each curtain wall unit.   To this end, delivery by Defendants to Glasswall of particular "glass lites" was strategically scheduled to ensure that the curtain wall system could be fabricated per the Monadnock Contract requirements.

25.     Thus, failure of Defendants to timely deliver glass at the time agreed upon between Glasswall and Defendants would impede the fabrication of the entire curtain wall system at HPS. In other words, the efficient and unfettered fabrication of the curtain wall system was contingent upon Glasswall receiving glass that met its unique specifications in a timely manner.

**THE AGREEMENT WITH DEFENDANTS**

26.     In need of a supplier of glass for the Project, Glasswall inquired about Defendants' capability to deliver the glass required under the Monadnock Contracts, which notably specified that the all tempered glass be heat soaked.

27.     Pursuant to Glasswall's request, on February 8, 2013, Defendants delivered a Product Quotation originating from its Jacksonville facility to Glasswall establishing the terms under which Defendants promised to deliver the glass for the Project (the "Quotation"). A copy of the Quotation is attached hereto as **Exhibit "B."**

28.     Relying upon Defendants' representations that they had the capability to meet Glasswall's needs under the Monadnock Contracts, on June 17, 2013, Glasswall transmitted its purchase order number 12-7GW-015 (the "Glasswall Purchase Order"). A copy of the Glasswall Purchase Order is attached hereto as **Exhibit "C."**

6

29.     Glasswall's acceptance of the terms set forth in the Quotation through the transmittal of the Glasswall Purchase Order established a binding agreement between the parties (the "Glass Supply Agreement").

30.     Under the Glass Supply Agreement, Defendants agreed to supply the glass required for the Project for the sum amount of $2,393,196.98 and called for an approximately 6+ week lead time in delivering the glass.  Again, it also specified that heat-soaked tempered glass would be delivered.

**DEFENDANTS'S ATLANTA FACILITY**

31.     After receiving Glasswall's Purchase Order, Defendants announced the opening of a new fabrication facility near Atlanta, Georgia (the "Atlanta Facility").

32.     In press releases, Defendants referred to the Atlanta Facility as a "start-up," and represented that it was operating with "new software, new equipment and new processes." A copy of the Nov. 19, 2013 Article has been attached hereto as **"Exhibit D."**

33.     At no time leading up to Glasswall's transmittal of the Glasswall Purchase Order did Defendants disclose that any of the glass produced by Defendants under the Glass Supply Agreement would be manufactured at the experimental Atlanta Facility.

34.     Based upon information and belief, the manufacturing of glass that Defendants furnished to Glasswall for use at HPS began at the Atlanta Facility.

35.     Throughout Defendants' engagement with Glasswall, glass manufactured at the Atlanta Facility was non-conforming, poor quality, delivered late, and otherwise failed to comply with the specifications of the Glass Supply Agreement.

36.     Because of Defendants difficulty in producing the glass units under the Glass

7

Supply Agreement, Glasswall encountered serious impediments in the fabrication of the curtain wall units at its Miami facility, which, in turn, negatively impacted Glasswall's ability to supply/deliver the curtain wall units to HPS.

37.     In addition, after beginning its production of glass under the Glass Supply Agreement, due to the non-conforming products untimely delivered by the Atlanta Facility, Defendants made representations that at least some of the glass called for under the Glass Supply Agreement would be manufactured at Defendants' Jacksonville facility.

38.     Despite their representations to instill new measures to improve the quality of production at the Atlanta and Jacksonville Facilities, Defendants continued to manufacture non-conforming products which were delivered late.

39.     Due, in part at least, to these missteps, Defendants, through a Press Release dated December 30, 2014, decided to abandon operations at the Atlanta Facility and transfer the assets of the business on December 29, 2014, citing the business's underperformance and the need to "restore the profitability of the architectural glass business in the region." A copy of the Dec. 30, 2014 Press Release has been attached hereto as **Exhibit "E."**

**CURTAIN WALL FABRICATION**

40.     Glasswall's process to manufacture the curtain wall for the Projects involved:  (1) pre-fabricating the frames in preparation to receive the glass, and (2) receipt of manufactured glass from Defendants for installation in the frames (glazing).

41.     The frames fabricated by Glasswall in fabricating the curtain wall system were not uniform pieces, but were each specially designed to create a customized system exclusively designed for the Project.

8

42.     As such, each lite of glass that was produced and delivered by Defendants was uniquely designed to be paired with and glazed into specific frames comprising the curtain wall system.

43.     To ensure an efficient production process for the Project, when the customized frames were assembled and ready to be glazed, the fabricated glass from Defendants was expected to be present at the Glasswall facility and ready for installation.

44.     Ideally, once Glasswall received the specific glass product from Defendants, Glasswall would (1) shake out the glass lites and stage them for installation, (2) glaze the pre-fabricated frames, and (3) crate and ship the finished product to HPS for installation by Monadnock.

45.     Accordingly, if the glass from Defendants was either not timely delivered or not delivered in a production-ready manner or condition, per the agreed upon unit specifications, then Glasswall's production efficiency would be negatively impacted.   The frames assembled by Glasswall in anticipation of a release would either need to wait in their current location on the production floor, or need to be moved from the production floor to a holding area from which they could be brought back to the production floor when good glass was received from Defendants.[2]

46.     Because of the customized nature of the system, Defendants' failure to deliver the specified glass would result in the suspension in fabrication of the curtain wall system for HPS.

47.     As such, it was essential that Defendants deliver identifiable, installation-ready glass in the sequence agreed to by the parties.   Glasswall expended a significant amount of time and resources carefully planning and coordinating Project schedule requirements, its frame

---

[2] As detailed later herein, at times, Glasswall was forced to fabricate curtain wall units using plywood panels in place of glass lites prior to shipping the units to HPS. *See Infra* ¶ 67.

9

assembly, and Defendants' glass delivery schedule.

48.    If any setbacks in this process occurred, Glasswall's production of curtain units would suffer.

49.    Even more, Glasswall would be forced to devote additional time and resources– in the form of increased labor and production costs – to compensate for Defendants' botched deliveries consisting of untimely deliveries, broken lites, and otherwise non-conforming product.

50.    Accordingly, Defendants' production and shipping obligations to Glasswall were explicitly defined in the purchase contracts and scheduled to meet Glasswall's production requirements.

51.    To meet its curtain wall production schedule for the Project, Glasswall expected and relied upon Defendants' ability to timely provide identifiable, installation-ready glass lites in the sequence agreed to by the parties.

**HPS PRODUCTION REQUIREMENTS**

52.    In planning its schedule of curtain wall production and delivery to the Project, Glasswall relied upon Defendants' representation of its glass production capabilities, inherent in the Quotation. Notably, Defendants failed to disclose that they planned to produce glass units at the new untested Atlanta Facility.

53.    Defendants knew that Glasswall's curtain wall unit production plan for HPS was directly contingent upon Defendants' proper and timely performance of the terms contained in the Glass Supply Agreement – terms that Defendants knew or should have known that they could not meet using the "start-up" Atlanta Facility.[3]

---

[3] Before Glasswall could crate and ship a finished curtain wall to HPS, it must have received the glass lite from Defendants and fabricate the curtain wall at its Miami facility.

10

54.     Glasswall's ability to fabricate curtain wall units for the Project was directly dependent upon Glasswall receiving glass from Defendants that was: (a) timely, (b) properly fabricated, (c) identifiable and (d) intact.

**DEFENDANTS' PROBLEMS**

55.     From the outset Glasswall's production operation was significantly hindered due to a multitude of Defendants' deficiencies.

56.     Defendants' deficiencies include:

- inability to deliver heat-soaked glass;
- delivering broken glass;
- delivering defective glass;
- labeling problems;
- incorrect packing slips;
- PIB[4] problems with the glass lites;
- late deliveries;
- other quality issues.

57.     These failures directly resulted in Glasswall's inability to meet the planned delivery schedule for the Project, which, in turn, impacted fabrication of the units at Glasswall and on-site installation of the curtain wall system at HPS.

58.     Glasswall's ability to glaze and deliver the window units in a manner that could be coordinated with the on-site erection at HPS, as called for under the Monadnock Contracts, hinged on Defendants' ability to meet their obligations set forth under the Glass Supply Agreement.

59.     As a result of Defendants' inability to deliver the specified heat soaked glass, improper labeling, non-conforming product and late deliveries, Glasswall experienced delays in manufacturing and delivering curtain wall units for on-site installation, as well as an inability to

---

[4] Polyisobutylene, a glass sealant.

11

maintain a productive workflow.[5]

60.    Each time a defective or broken piece of glass was identified, Glasswall's performance and work productivity was impacted by additional handling of both the glass and the unit frames awaiting glazing, resulting in inefficiencies and increased costs to Glasswall's work.

61.    Since no one could tell when a defective or wrongly tagged lite would appear on the glazing line until it was unpacked and inspected, no dedicated force could effectively be assigned to this task, so that it had to be performed or assisted with by the people on the line, disrupting and delaying their regular work pattern.

62.    Further compounding the problem, each affected curtain wall unit had to be individually removed from the production floor to a storage area, tagged and inventoried for future retrieval when a proper lite was received.

63.    The emptied crate in which the glass was delivered by Defendants needed to be moved and in most cases re-used to house the glass in a separate storage area in case Defendants requested a return or a verification visit.  Glasswall then had to procure new glass for the frame waiting to be glazed, which meant further administrative work to order the replacement glass.

64.    When Defendants did eventually deliver an acceptable replacement, or when Glasswall managed to identify and properly re-tag a mis-tagged or mis-coded lite, Glasswall had to retrieve and forklift the corresponding frame back to the production line for glazing, necessarily disrupting the production line— driving down Glasswall's production efficiency and driving up its labor costs.

65.    Further hampering Glasswall's manufacturing efforts, a late-glazed unit often

---

[5] In order for Glasswall to effectively feed its production lines, it was critical that Defendants accompany the shipped product with accurate, consistent and reliable shipping information identifying what product was being shipped.

12

meant that it missed the scheduled release and shipment of the remaining units within any particular release, thereby requiring special tagging, shipping instructions, and site delivery instructions and handling. Again, Defendants' failed delivery further impacted Glasswall's labor and administrative costs.

66.     Without question, Defendants' deficiencies had a direct effect on Glasswall's assembly, glazing, shipping and receiving operations; in short, every aspect of Glasswall's ability to produce and timely complete its work.

67.     Further, in the absence of conforming glass and due to Defendants' errors, at times, Glasswall was forced to install plywood panels in lieu of glass in certain curtain wall units and ship the curtain wall unit without glass to HPS. After receiving the proper lites from Defendants, Glasswall would then have to ship the glass to the site for installation at HPS instead of installing it in the fabrication plant in Miami.

68.     As a result, Glasswall was forced to pay third-party contractors to conduct field glazing operations at the Project.

69.     Not only did Defendants' poor performance drive up Glasswall's costs in fabricating the HPS curtain wall system, but because of the botched glass deliveries, Glasswall's production of curtain wall units for the Project - which was originally estimated to be completed in March 2014 - was delayed through late October 2014.

**DEFENDANTS' ATLANTA FACILITY LEADS TO POOR PERFORMANCE**

70.     Defendants' use of its untested and unproven "start-up" Atlanta Facility was, in large part, responsible for Defendants' failure to meet its continuing obligations under the Glass Supply Agreement- a fact that is highlighted through Defendants' decision to abandon the facility

13

shortly after its opening.

71.     In fact, based upon information and belief, by the end of 2013, Glasswall encountered problems with over 1,000 units fabricated in Defendants' Atlanta Facility.

72.     As a result of Defendants' manufacturing and delivery deficiencies, a November 15, 2013 conference call and power point slide presentation was conducted, wherein Defendants acknowledged that remedial measures were necessary in order to improve the Defendants' performance (the "Presentation"). A copy of the Presentation is attached hereto as **Exhibit "F."**

73.     In the Presentation, Defendants' senior management not only stated that its performance was "below internal and industry standards," but also represented that it "[d]elayed shipments," "[h]ad a high reject rate," and "[h]ad low order completion." Exhibit F.

74.     The Presentation also outlined the implementation of certain measures to remedy Defendants' failure, including:  double inspection of all shipped lites; re-inspection of lites by Defendants' personnel at Glasswall's Miami facility; and production of lites at its Jacksonville, Florida factory utilizing proven technology and processes.

### DAMAGES INCURRED BY GLASSWALL DUE TO DEFENDANTS' FAILURES

75.     Ultimately, however, all reform efforts taken by Defendants were unsuccessful, as Defendants' delivery of glass continued to be plagued by the same issues well into 2014.

76.     Further the Defendants' employees that were placed at Glasswall's Miami factory to ameliorate Defendants' deficiencies were negligent in performing their responsibilities, and, otherwise, failed in their mission to improve Defendants overall performance under the Glass Supply Agreement.

77.     Because of the litany of problems involving Defendants' production of glass,

14

Glasswall's work was inefficient and delayed, resulting in increased operating and administrative costs.

78.     Moreover, Glasswall expended substantial labor during the months of November 2013, December 2013, and January 2014 sorting through received material and identifying and tagging Defendants' glass.  This not only increased Glasswall's labor costs, but the workforce necessary to perform this additional work further impacted Glasswall's productivity.

79.     Glasswall's fabrication relied upon and was based on commitments and representations by Defendants in providing installation ready glass, such that when Defendants' glass material arrived, the glass could be installed in the frames (glazed), the finished units packed (or crated), and then shipped to the Project.

80.     Upon entering into the Glass Supply Agreement, Defendants knew that Glasswall's ability to perform under the Monadnock Contract was contingent upon Defendants supplying the requisite lites according to the agreed upon schedule.

81.     This process did not happen.  While Glasswall's curtain wall frames were fabricated and ready to accept glass as planned, the glass that was to support production from Defendants was not available and Glasswall's frame assembly proceeded ahead of available material to finalize glazing.  In turn, Defendants' inability to deliver specific glass lite products negatively impacted Glasswall's ability to fabricate the entire curtain wall system in sequence and efficiently.

82.     Glasswall continued frame production as far as was practicable and made every effort to minimize lost time, in mitigation of its damages caused by Defendants.

83.     Glasswall employees were required to work thousands of hours of overtime in efforts to overcome Defendants' mistakes, making every attempt to maintain its schedule with

15

Monadnock.

84.     Ultimately, due to Defendants failure to deliver the contracted glass Monadnock terminated the Monadnock Contract with Glasswall.

85.     All told, the damages incurred by Glasswall include but are not limited to manufacturing costs, labor costs, liabilities created by Defendants' breaches, unabsorbed office overhead costs, legal fees, storage costs and consulting fees.

86.     Indeed, Glasswall suffered extensive damages and claims of damages in excess of $20,000,000.00 which as resulted in the failure of the Company.

87.     All conditions precedent to the maintenance of this action have occurred, have been performed, or have otherwise been waived or excused.

## COUNT I — BREACH OF CONTRACT

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

88.     Glasswall and Defendants entered into the Glass Supply Agreement, wherein Defendants were obligated to supply glass lites to Glasswall for the production of curtain wall units per the specifications of the Project.

89.     Glasswall fully performed its obligations under the Glass Supply Agreement.

90.     Defendants breached the Glass Supply Agreement by failing to timely deliver glass to Glasswall that were in conformance with the specifications contained in the Glass Supply Agreement.

91.     Defendants' delivery of glass was replete with deficiencies, which included: incorrectly labeled glass, improperly packaged glass, non heat-soaked glass, broken and/or

16

scratched glass, incorrectly fabricated lites and glass lite units that were otherwise non-conforming.

92.     In addition, because of Defendants' breach, Monadnock terminated the Monadnock Contract.

93.     As a result of this breach, Glasswall has suffered damages

**WHEREFORE,** Plaintiff, GLASSWALL, LLC, demands judgment against Defendants, AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALTY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and further relief as this Court deems just and proper.

## COUNT II — FRAUD IN THE INDUCEMENT

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

94.     In early 2013, Defendants made misrepresentations about their ability to produce glass to Glasswall's specifications and timeline pursuant to its obligations under the Monadnock Contract.

95.     Defendants represented that they had the capability to produce heat-soaked tempered glass units, in the quantity Glasswall required under the Monadnock Contract, in a timely manner to allow Glasswall to meet its production schedule to fulfill its production requirements under the Monadnock Contract.

96.     Defendants misrepresentations are evidenced in the Quotation that outlined Defendants' glass lite production capabilities.

97.     At the time of this misrepresentation, Defendants knew or should have known that

17

they could not fulfill their obligations, as they were relying on a "start-up" factory that was utilizing unused technology and new processes.

98.     Defendants made these misrepresentations and, otherwise failed to disclose that they planned on utilizing an untested facility to meet their contractual obligations in producing glass in order to induce Glasswall into entering the Glass Supply Agreement.

99.     Based upon Defendants' misrepresentation, Glasswall entered into the Glass Supply Agreement.

100.    Because of Defendants' reliance on the untested Atlanta Facility in production, Defendants failed to timely deliver glass products pursuant to the terms of the Glass Supply Agreement and routinely delivered defective or nonconforming lites.

101.    As a result of Glasswall's reliance on Defendants' misrepresentations concerning their production capabilities, Monadnock terminated the Monadnock Contract and Glasswall suffered extensive damages.

**WHEREFORE**, Plaintiff, GLASSWALL, LLC, demands judgment against Defendants, AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALTY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and further relief as this Court deems just and proper.

<u>**COUNT III— FRAUD IN THE PERFORMANCE**</u>

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

102.    Upon entering into the Glass Supply Agreement with Glasswall, Defendants were unable to timely deliver glass products conforming to the Agreement's specifications.

18

103.    In spite of its early failures, Defendants made ongoing representations that they would implement measures to improve Defendants' performance under the Glass Supply Agreement to meet their obligations.

104.    These representations include comments made by Defendants' management at the Presentation that Defendants had devised "actions to improve performance," which included "double inspection" prior to shipment, "re-inspect[ion] [of] [a]ll finished goods and "[n]ew [m]anagement structure & accountability."

105.    At the time of making these representations, Defendants lacked any plan to improve quality control or otherwise instill measures at the Atlanta Facility to ensure production of high quality, conforming glass.

106.    Rather, Defendants made these misrepresentations to induce Glasswall to continue to rely upon them as its manufacturer of glass lites.

107.    Based upon Defendants' ongoing representations to improve their production, Glasswall continued to rely on Defendants as its supplier of glass products rather than seeking an alternative vendor.

108.    Despite their representations otherwise, Defendants lacked any demonstrable measures to improve their performance, as they continued to supply glass that was not timely delivered, was of low quality and otherwise did not meet the specifications under the Glass Supply Agreement.

109.    As a result of Glasswall's reliance on Defendants' ongoing misrepresentations concerning their remedial measures, Glasswall suffered extensive damages.

**WHEREFORE**, Plaintiff, GLASSWALL, LLC, demands judgment against Defendants,

19

Jesse Dean-Kluger, P.A.
1110 Brickell Avenue Suite 208, Miami, Florida 33131 Phone: 305-534-3460 Fax: 786-206-3075

AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALITY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and further relief as this Court deems just and proper.

<u>**COUNT IV– BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**</u>

Glasswall adopts and re-alleges the allegations contained in paragraphs 1 through 87 above as if fully and expressly set forth herein.

110.    Glasswall and Defendants entered into the Glass Supply Agreement, under which Defendants were charged with supplying the glass that Glasswall intended to use to fabricate a curtain wall system for the residential towers at HPS.

111.    At the time of entering the Glass Supply Agreement, Defendants had knowledge that Glasswall was utilizing the glass products to glaze curtain wall units at its Miami factory and ultimately fabricate the curtain wall system on-site at HPS that comprised the curtain wall system for the HPS project.

112.    Defendants had an understanding of the manner in which the glass lites that they were supplying to Glasswall would be used.

113.    Defendants breached the implied warranty because the glass lites that were ultimately supplied to Glasswall suffered various defects, including scratched or broken glass, coating issues, incorrect fabrication and improper labeling, among others.

114.    As a result of the various defects, Glasswall suffered extensive damages.

**WHEREFORE**, Plaintiff, GLASSWALL, LLC, demands judgment against Defendants, AGC GLASS COMPANY NORTH AMERICA and POMA GLASS & SPECIALTY WINDOWS, INC., for compensatory damages, pre-judgment interest, and for such other and

Jesse Dean-Kluger, P.A.
1110 Brickell Avenue Suite 208, Miami, Florida 33131 Phone: 305-534-3460 Fax: 786-206-3075

further relief as this Court deems just and proper.

## RESERVATION OF RIGHTS

Plaintiff reserves the right to amend this Complaint to seek punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right by a jury.

Dated: March 21, 2017.

Respectfully submitted,

**JESSE DEAN-KLUGER, P.A.**
*Counsel for Plaintiff*
1110 Brickell Avenue, Suite 208
Miami, Florida 33131
Phone:  (305) 534-3460
Fax:  (786) 206-3075


By:  ___/s/ Jesse Dean-Kluger_____
**JESSE DEAN-KLUGER**
Fla. Bar No. 0062201

21

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# EXHIBIT D

# BERGER|HARRIS

**MICHAEL W. McDERMOTT, ESQUIRE**
E-mail: mmcdermott@bergerharris.com

**1 October 2018**

**Via Email – richard.rose@millermartin.com**

Mr. Richard Rose
Miller & Martin PLLC
832 Georgia Avenue, Suite 1200
Chattanooga, TN 37402

    *Re: Deficient Subpoena Directed to* ███████████████

Dear Mr. Rose:

    This firm represents ███████████████ in connection with a "Subpoena to Appear and Testify at a Hearing or Trial" issued by your firm and served on ██████ ███████████ on September 24, 2018. The Subpoena has a return date of October 4, 2018.

    The Subpoena attaches Fed. R. Civ. P. 45, but it is entirely unclear what steps, if any, were undertaken to comply with the rule.

    *The Subpoena Exceeds Geographical Limits*: A subpoena that purports to require compliance at a location that exceeds the 100-mile limit set forth in Fed. R. Civ. P. 45(c)(1)(A), 45(c)(2)(A) must be quashed or modified to comply with that limit. The demanded compliance here (requiring attendance at an unspecified hearing, deposition, or trial, and producing documents) exceeds that statutory limit by more than 600 miles.

    *The Subpoena Provides Insufficient Time to Comply*: A subpoena that does not provide a reasonable amount of time to comply is facially defective and must be quashed or modified. Fed. R. Civ. P. 45(d)(3)(A)(i). The Subpoena bears a date of September 19, 2018 and was served on September 24, 2018. The Subpoena demands compliance within 10 days after it was served, on October 4, 2018 at a location over

Mr. Richard Rose
Miller & Martin PLLC
October 1, 2018
Page 2 of 3

700 miles away (as set forth above).  The Subpoena demands this 10-day compliance from a non-party and purports to require production of thirteen categories of documents (some categories having as many as sixteen sub-categories) at a location over 700 miles away.  The Subpoena also demands 10-day compliance by a non-party by attendance at a hearing or trial at a location over 700 miles away.

   *The Subpoena Seeks Disclosure of Protected Information:* A subpoena seeking information that is protected by privilege or other legally-recognized exceptions to compelled disclosure must be quashed or modified unless some "exception or waiver applies[.]" Fed. R. Civ. P. 45(d)(3)(A)(iii).  The Subpoena demands that non-party to the litigation ███████████████ meet a 10-day compliance deadline requiring production of thirteen categories of documents at a location over 700 miles away.  A number of those categories call specifically for information protected by privilege and other legally-recognized exceptions to compelled disclosure, including "any and all documents" and "communications discussing the formation of" ███████████████ and other internal documents and communications involving counsel to ███████████ ████.

   Under the rules, a timely-filed motion to quash "*must*" be granted where any one of the above three circumstances are present. *See* Fed. R. Civ. P. 45(d)(3)(A)(i-iii) (emphasis added).  Here, all three circumstances are present.

   Finally, the rules make clear that a party issuing a subpoena has an affirmative duty to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1).  It appears that few or no steps have been undertaken in that regard.  If motion practice relating to the subpoena is required at this juncture ███████████████ will ask the Court to "enforce this duty by imposing an appropriate sanction – which may include lost earnings and reasonable attorney's fees – on a party or attorney who fails to comply." *Id.*

Mr. Richard Rose
Miller & Martin PLLC
October 1, 2018
Page **3** of **3**

Kindly contact me to confirm that you will not require ████████████ to file a Motion to Quash the Subpoena as issued.

Sincerely Yours,

MICHAEL W. MCDERMOTT

# EXHIBIT E



RICHARD C. ROSE

Direct Dial 423-785-8268
Direct Fax 423-321-1558
richard.rose@millermartin.com

October 2, 2018

**VIA ELECTRONIC MAIL**

Michael W. McDermott
Berger Harris LLP
1105 North Market Street, 11th Floor
Wilmington, DE 19801
MMcdermott@bergerharris.com

RE:   *Glasswall, LLC v. AGC Flat Glass North America, Inc., et al.*
      USDC Eastern District of Tennessee, No. 3:17-CV-332-HSM-DCP

Dear Mike,

It was a pleasure speaking with you today. This will confirm that I am withdrawing the subpoena based upon, among other things, your representation that you believe the principal place of business of ██████████ is in Wilmington, Delaware. As I told you, no motion to quash is necessary. As I also told you, we will work with you on a reasonable time to respond to the subpoena, but I suspect there are very few documents that exist in connection with this entity, which appears to have been formed approximately 60 days ago and in connection with the Settlement Agreement attached to the subpoena. Please let me know the following:

1) The address at which ████████████ resides or regularly transacts business;

2) The preferred return for a second subpoena (your office?);

3) Whether you will accept service of a second subpoena; and

4) The date on which you can produce the documents (i.e., what you consider a "reasonable" time).

Finally, as I told you, it is not our intention to request legitimate attorney-client privileged documents. Any documents which are privileged would be placed on a privilege log pursuant to Fed. R. Civ. P. 45(e)(2)(A)(i-ii). Again, I think that there will be very few documents, privileged or otherwise, but if that is not the case, please let me know.

Please provide the above-referenced information on or before October 5, 2018. If I do not hear from you, we will have no choice but to reissue the subpoena with a return to your office. Obviously, a legitimate business will provide you, and us, this information.

I look forward to working with you.

Best regards,

Richard C. Rose

RCR/ks
cc:   Michael Dumitru, Esq.

17083482v1
26970-0006

Volunteer Building Suite 1200
832 Georgia Avenue | Chattanooga, TN | 37402-2289
Office 423.756.6600 Fax 423.785.8480
millermartin.com

ATLANTA
CHARLOTTE
CHATTANOOGA
NASHVILLE

# EXHIBIT F

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Tennessee

| | |
|---|---|
| GLASSWALL, LLC | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   3:17-CV-332-HSM-DCP |
| AGC FLAT GLASS NORTH AMERICA, INC., et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: ████████, c/o BH Registered Agents, LLC, 1105 N Market Street, 11th Floor, Wilmington, DE 19801

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
See Exhibit B.

| Place: ████████████ | Date and Time:<br>11/08/2018 9:00 am |
|---|---|

The deposition will be recorded by this method:   Court Reporter and Videographer

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Exhibit A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/15/2018

| *CLERK OF COURT* | OR | *Rich C. Rose* |
|---|---|---|
| Signature of Clerk or Deputy Clerk | | Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants
, who issues or requests this subpoena, are:

Richard C. Rose, Miller & Martin PLLC, (423) 785-8268, richard.rose@millermartin.com
Michael Dumitru, Miller & Martin PLLC, (423) 785-8331, michael.dumitru@millermartin.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   3:17-CV-332-HSM-DCP

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

    ❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## DEFINITIONS FOR EXHIBITS A AND B

Unless otherwise specifically defined, each term used herein shall have the meaning assigned to such term in Exhibits A and B below. Furthermore, whenever appropriate, the singular form of a word should be interpreted in the plural, and similarly the plural form should be interpreted in the singular.

A. "Person" means a natural person or corporation, partnership, or other business entity.

B. "Glasswall" means the Plaintiff in this action, Glasswall, LLC, and its employees and agents.

C. "AGC" means Defendant AGC Flat Glass North America, Inc.

D. "POMA" means Defendant POMA Glass & Specialty Windows, Inc.

E. "Project" refers to the Hunters Point South Project in Long Island City, New York, as referenced in the complaint filed in this action attached hereto as Exhibit 1.

F. The term "Settlement Agreement" refers to the agreement executed on or about July 17, 2018, attached hereto as Exhibit 2.

G. The term "Assignment" refers to the Assignment of Judgment and Claims attached to the Settlement Agreement as Exhibit A.

H. The term "documents" refers to documents, electronically stored information (ESI), and tangible things and shall be interpreted as broadly and comprehensively as permitted by the Federal Rules of Civil Procedure, to include drafts, originals, and any non-identical copies, regardless of whether existing in hard print or as ESI. ESI includes any type of information that is stored electronically, including that described in Rule 34 of the Federal Rules of Civil Procedure.

I.  The phrases "relate to," "related to," and "relating to" include and are to be interpreted as meaning: pertaining to, recording, evidencing, constituting, containing information about, setting forth, reflecting, showing, disclosing, describing, discussing, analyzing, explaining, summarizing, concerning or referring to, whether directly or indirectly, whether in whole or in part.

J.  The words "and," "and/or," and "or" shall each be deemed to refer to both their conjunctive and disjunctive meanings, so as to include any information within the scope of any of the requests in which it is contained. The words "each" and "any" shall mean "each and every" as well as "any one."

K.  Unless otherwise specifically stated, these requests relate to the time period January 1, 2013 through the present.

## EXHIBIT A

## DOCUMENTS REQUESTED UNDER FED. R. CIV. P. 45

1. Any and all documents related to the formation of ▮▮▮▮▮▮▮, including, but not limited to, operating agreements, bylaws, authorization forms, organizational charts, and communications discussing the formation of the entity.

2. Any and all documents identifying the members of ▮▮▮▮▮▮. To the extent any member is a corporation or limited liability company, please identify the members of such entity or entities.

3. Any and all documents related to the identity of any lawyers who created the formation documents for ▮▮▮▮▮▮.

4. Any and all documents evidencing communications between ▮▮▮▮▮▮ and any other party to the Settlement Agreement.

5. Any and all documents, other than the Settlement Agreement, evidencing agreements between ▮▮▮▮▮▮ and any other party to the Settlement Agreement.

6. Any and all documents, other than the Settlement Agreement, evidencing agreements between ▮▮▮▮▮▮ and any other party.

7. Any and all documents identifying the person or persons who paid the formation fees, taxes, filing fees, or any other fees of ▮▮▮▮▮▮.

8. Any and all documents evidencing and relating to monetary transfers by and between ▮▮▮ ▮▮▮▮ on the one hand, and one or more parties to the Settlement Agreement, on the other.

9. Any and all documents evidencing and relating to monetary transfers between ▮▮▮ ▮▮▮▮, on the one hand, and any one or more of the following individuals or entities, on the other:

   a) Jason B. Giller;
   b) James P. Cinque;
   c) Jesse Dean-Kluger;
   d) Clinton B. Flagg;
   e) W. Morris Kizer;
   f) Jason B. Giller, P.A.;
   g) Cinque & Cinque, P.C.;
   h) Jesse Dean-Kluger, PA;
   i) Clinton B. Flagg, P.A.;
   j) Gentry, Tipton & McLemore, P.C.;
   k) Crabtree & Associates, P.A.;
   l) Schiff Hardin LLP;
   m) Thacher Associates, LLC;

      n)  Arent Fox LLP;
      o)  Robert Wane Pearce, PA; and
      p)  Ugo Columbo.

10. Any and all documents, whether internally at ██████████ or with a third-party, discussing the Settlement Agreement.

11. Any and all documents, whether internally at ██████████ or with a third-party, discussing the Assignment.

12. Any and all documents evidencing ██████████'s intent to pursue, assign, transfer, or otherwise dispose of the judgment referenced in the Assignment.

13. Any and all documents by and between ██████████, one the one hand, and any one or more individuals or entities, on the other:

      a)  Jason B. Giller;
      b)  James P. Cinque;
      c)  Jesse Dean-Kluger;
      d)  Clinton B. Flagg;
      e)  W. Morris Kizer;
      f)  Jason B. Giller, P.A.;
      g)  Cinque & Cinque, P.C.;
      h)  Jesse Dean-Kluger, PA;
      i)  Clinton B. Flagg, P.A.;
      j)  Gentry, Tipton & McLemore, P.C.;
      k)  Crabtree & Associates, P.A.;
      l)  Schiff Hardin LLP;
      m) Thacher Associates, LLC;
      n)  Arent Fox LLP;
      o)  Robert Wane Pearce, PA; and
      p)  Ugo Columbo.

14. Any and all documents evidencing ██████████'s communications with Westchester Fire Insurance Company.

## EXHIBIT B

## MATTERS FOR EXAMINATION UNDER FED. R. CIV. P. 30(B)(6)

Defendants, by and through their attorneys Miller & Martin PLLC, hereby request that you produce for deposition the appropriate corporate representative(s) of ▮▮▮▮▮▮▮ who has knowledge and information of the following subjects:

1. The formation of ▮▮▮▮▮▮▮▮.

2. The identity of ▮▮▮▮▮▮▮▮'s members. To the extent any member is a corporation or limited liability company, please be prepared to identify the members of such entity or entities.

3. Ugo Columbo's title and role in ▮▮▮▮▮▮▮.

4. The identity of counsel who assisted with the formation of ▮▮▮▮▮▮▮.

5. ▮▮▮▮▮▮▮'s rights and obligations under the Settlement Agreement and Assignment.

6. ▮▮▮▮▮▮▮'s efforts to assign, enforce, pursue, transfer, or otherwise dispose of the judgment referenced in the Assignment.

7. ▮▮▮▮▮▮▮'s communications, whether internal or with another party, regarding the Settlement Agreement.

8. ▮▮▮▮▮▮▮'s communications, whether internal or with another party, regarding the Assignment.

9. Monetary transfers between ▮▮▮▮▮▮▮ and any other party to the Settlement Agreement.

10. ▮▮▮▮▮▮▮'s communications with Westchester Fire Insurance Company pertaining to the actions and disputes identified in the Settlement Agreement.

11. All assets and liabilities of ▮▮▮▮▮▮▮.





USPS.com® - USPS Tracking® Results

Page 1 of 2

# USPS Tracking®  FAQs > (https://www.usps.com/faqs/uspstracking-faqs.htm)

## Track Another Package  +

**Tracking Number:** 70120470000077934917

Remove ✕

**Expected Delivery on**

# THURSDAY
# 18  OCTOBER
2018 ⓘ

See Product Information ⌄

Feedback

## ✅ Delivered

October 18, 2018 at 12:41 pm
Delivered, Left with Individual
WILMINGTON, DE 19801

**Get Updates** ⌄

| | |
|---|---|
| **Text & Email Updates** | ⌄ |
| **Tracking History** | ⌄ |
| **Product Information** | ⌄ |

See Less ⌃

# EXHIBIT G

# BERGER|HARRIS

**MICHAEL W. McDERMOTT, ESQUIRE**
E-mail: mmcdermott@bergerharris.com

**29 October 2018**

_Via Email_ - richard.rose@millermartin.com

Mr. Richard Rose
Miller & Martin PLLC
832 Georgia Avenue, Suite 1200
Chattanooga, TN 37402

> _Re:    Written Objections To Subpoena Directed to_ ██████████

Dear Mr. Rose:

This firm represents ████████████ in connection with a Subpoena issued by your firm and directed to ████████████ on or about October 17, 2018.

████████ specifically objects to the documents and corresponding subjects of testimony sought in the subpoena on the grounds set forth below. For many of the same reasons set forth below, ████████████ expects to file a motion for a protective order or to quash the subpoena.

To be clear, ████████ is amenable to meeting and/or conferring as to how to proceed with respect to both the requested documents and the requested 30(b)(6) deposition in a manner that maintains all privileges and protections, and minimizes undue burden upon ████████ in accordance with Fed. R. Civ. P. 45. If a deposition turns out to be necessary in connection with the information sought by this subpoena, we expect to discuss a time and place appropriately convenient for any designated witness.

████████ objects to the subpoena because the categories of documents requested are overbroad and seek information not relevant to the litigation and not reasonably calculated to lead to the discovery of admissible evidence.

▸ 1105 N. Market Street, Suite 1100
  Wilmington, DE 19801
  _phone:_ 302|655|1140
  _fax:_ 302|655|1131
  _web:_ www.bergerharris.com

Mr. Richard Rose
Miller & Martin PLLC
October 29, 2018
Page 2 of 3

███████ objects to the extent the subpoena seeks information or documents that are subject to the attorney-client privilege, business strategy immunity or work product protection. The subpoena seeks information in a number of categories calling specifically for information protected by privilege and other legally-recognized exceptions to compelled disclosure, including "any and all documents" and "communications discussing the formation of" ███████ and other internal documents and communications involving counsel to ███████.

███████ objects to the subpoena to the extent it would unreasonably require ███████ to produce information or documents that are in the possession of, or are equally obtainable from or accessible to, actual parties to this litigation or from other sources.

███████ objects to the subpoena to the extent it seeks proprietary and/or business confidential information that is or may be protected from disclosure and/or subject to confidentiality agreements between ███████ and others.

███████ is not agreeable to hosting the deposition you unilaterally noticed to take place at our offices on November 8. As noted above, we are agreeable to meeting and conferring about the need for a ███████ designee in light of any documents produced after resolution of the objections herein, and if a designee is necessary we will propose potential times and locations that are mutually agreeable and convenient to the designee and all counsel.

*     *     *

Finally, ███████ will not produce any documents in response to the subpoenas pending resolution of the objections herein, and if necessary, any motions. To the extent ███████ responds to the Subpoena after the parties have met and conferred concerning the scope and timing of the same, ███████ would be responding on behalf of itself and will only provide information in ███████'s possession, custody and control. ███████ reserves the right to supplement, modify, or otherwise amend any objections asserted herein, either during a meet-and-

Mr. Richard Rose
Miller & Martin PLLC
October 29, 2018
Page **3** of **3**

confer or in arguments to the Court.  Nothing contained in or omitted from this letter is, or should be construed as, a limitation, restriction or waiver, express or implied, of any of ████████ 's rights and remedies in connection with any of the matters raised herein, all of which are expressly reserved.

Sincerely Yours,

MICHAEL W. MCDERMOTT

# EXHIBIT H

**Katie Smith**

| | |
|---|---|
| **From:** | Michael Mc Dermott <mmcdermott@bergerharris.com> |
| **Sent:** | Tuesday, November 6, 2018 5:31 PM |
| **To:** | Michael Dumitru |
| **Cc:** | Richard Rose |
| **Subject:** | RE: ▉▉▉▉▉▉▉▉ [M&M-content.26970.0006] |
| **Attachments:** | Ltr to Richard Rose dtd 10.29.18.pdf |

Mike:

This confirms our communication today and seeks to corrects certain self-servingly inaccurate descriptions below. ▉▉▉▉▉▉ communicated over a week ago by the letter that the both the date and location of the unilaterally set deposition was not available or agreeable and we also indicated that we desired to meet and confer regarding both the relevance and scope of any documents, as well as the need for a deposition.

Mike

**MICHAEL W. McDERMOTT, ESQ.**
**BERGER | HARRIS**
1105 North Market Street, 11th Floor
Wilmington, DE 19801
phone: 302 | 655 | 1140 x 222
fax: 302 | 655 | 1131
**mmcdermott@bergerharris.com**
**www.bergerharris.com**

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

> **From:** Michael Dumitru [mailto:Michael.Dumitru@millermartin.com]
> **Sent:** Tuesday, November 06, 2018 5:03 PM
> **To:** Michael Mc Dermott
> **Cc:** Richard Rose
> **Subject:** RE: ▉▉▉▉▉▉▉▉ [M&M-content.26970.0006]
>
> Mike,
>
> This email confirms our conversation earlier this afternoon regarding the subpoena to ▉▉▉▉▉▉, LLC, which commands the presence of a corporate representative and the production of documents of ▉▉▉▉▉▉ in Wilmington, Delaware on November 8, 2018. After not hearing back from you regarding the upcoming deposition, we called your office at approximately 4:00 p.m. During the call, we informed you that we were preparing to book airfare to travel to Wilmington for the deposition. At that point, you made clear that ▉▉ ▉▉▉▉▉▉ would not be producing a deponent or documents in accordance with the subpoena. You also stated that the deposition could not take place in your office on November 8, 2018, but refused to provide us with any alternative locations or times. You made these representations even after acknowledging that the subpoena was valid on its face.

███████ has therefore made clear its intent to ignore a properly-issued and valid federal subpoena, which we will seek to enforce by way of appropriate motion. Accordingly, we are not going to waste our client's time, money, or airfare when no witness or documents will be made available on November 8, 2018.

Sincerely,
Mike Dumitru

**Michael Dumitru** 

**d** (423) 785-8331
**f** (423) 321-1789
Volunteer Building Suite 1200 | 832 Georgia Avenue | Chattanooga, TN 37402

**From:** Michael Dumitru [mailto:Michael.Dumitru@millermartin.com]
**Sent:** Wednesday, October 31, 2018 9:02 AM
**To:** Michael Mc Dermott <mmcdermott@bergerharris.com>
**Cc:** Richard Rose <Richard.Rose@millermartin.com>
**Subject:** RE: ███████ [M&M-content.26970.0006]

Mike,

Thank you for your email. Going forward, please be sure to copy Richard on all correspondence regarding this matter to ensure we respond promptly.

We look forward to hearing from you regarding a proposed date for your requested meet-and-confer.

Thanks,
Mike

**Michael Dumitru** 

**d** (423) 785-8331
**f** (423) 321-1789
Volunteer Building Suite 1200 | 832 Georgia Avenue | Chattanooga, TN 37402

**From:** Michael Mc Dermott [mailto:mmcdermott@bergerharris.com]
**Sent:** Wednesday, October 31, 2018 8:58 AM
**To:** Michael Dumitru <Michael.Dumitru@millermartin.com>
**Subject:** RE: ███████ [M&M-content.26970.0006]

Friday no good for me.  Working on  a time will get back to you.

MICHAEL W. McDERMOTT, ESQ.
**BERGER|HARRIS**
1105 North Market Street, 11th Floor
Wilmington, DE 19801
phone: 302|655|1140 x 222
fax: 302|655|1131

2

mmcdermott@bergerharris.com
www.bergerharris.com

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Michael Dumitru [mailto:Michael.Dumitru@millermartin.com]
**Sent:** Tuesday, October 30, 2018 9:25 AM
**To:** Michael Mc Dermott
**Cc:** Richard Rose
**Subject:** RE: ▓▓▓▓▓▓▓▓ [M&M-content.26970.0006]

Mike,

Thank you for your letter. We are happy to engage in a meet-and-confer to discuss your general objections. Let us know if you have any availability for a call this Friday. Richard and I are generally available.

Thanks,
Mike

### Michael Dumitru

**d** (423) 785-8331
**f** (423) 321-1789
Volunteer Building Suite 1200 | 832 Georgia Avenue | Chattanooga, TN 37402



**From:** Michael Mc Dermott [mailto:mmcdermott@bergerharris.com]
**Sent:** Monday, October 29, 2018 5:04 PM
**To:** Michael Dumitru <Michael.Dumitru@millermartin.com>
**Cc:** Richard Rose <Richard.Rose@millermartin.com>
**Subject:** RE: ▓▓▓▓▓▓▓▓ [M&M-content.26970.0006]

Michael:

Our communiques just about crossed in cyber space.

Mike

**MICHAEL W. M^cDERMOTT, ESQ.**
## BERGER|HARRIS
1105 North Market Street, 11th Floor
Wilmington, DE 19801
phone: 302|655|1140 x 222
fax: 302|655|1131
mmcdermott@bergerharris.com
www.bergerharris.com

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE

INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Michael Dumitru [mailto:Michael.Dumitru@millermartin.com]
**Sent:** Monday, October 29, 2018 4:12 PM
**To:** Michael Mc Dermott
**Cc:** Richard Rose
**Subject:** RE: ████████ [M&M-content.26970.0006]

Mike,

I hope this letter finds you well. I write to follow up on our prior correspondence pertaining to ████████, the latest of which was our transmission of a courtesy copy of the re-issued subpoena on October 15, 2018 (attached for your convenience). As you know, the subpoena commands that ████████ produce: (i) the documents described in Exhibit A to the subpoena; and (ii) a corporate representative to testify regarding the various matters set forth in Exhibit B to the subpoena. In our last letter, we asked that you confirm that the date, time, and location set forth in the subpoena were satisfactory, and made clear that we would be willing to work with ████████ on another reasonably proximate date and time. We have not yet heard from you, and are therefore assuming that the date and time are acceptable. If we are mistaken, please let us know. Further, please let us know whether you are willing to produce the requested documents prior to the deposition. Although we reserve all rights under the Federal Rules of Civil Procedure, providing us with the documents a few days in advance of the deposition will give us the ability to streamline our questioning and likely shorten the deposition.

Please let us hear from you as soon as possible, so that we can make the necessary arrangements. As always, if you would like to discuss this matter, please do not hesitate to give either Richard or me a call.

Sincerely,
Mike Dumitru


**Michael Dumitru**

**d** (423) 785-8331
**f** (423) 321-1789
Volunteer Building Suite 1200 | 832 Georgia Avenue | Chattanooga, TN 37402

MILLER
&MARTI

**From:** Michael Mc Dermott [mailto:mmcdermott@bergerharris.com]
**Sent:** Friday, October 5, 2018 5:37 PM
**To:** Richard Rose <Richard.Rose@millermartin.com>
**Cc:** Michael Dumitru <Michael.Dumitru@millermartin.com>
**Subject:** RE: ████████ [M&M-content.26970.0006]

Richard:

I received your letter from Tuesday.  Thanks.

My responses to your enquiries are as follows:

1. ███████████ is a Delaware-based business entity that resides and may be contacted for business through its primary address listed in Delaware.
2. ███████████ prefers only that the subpoena comply with the geographic limitations set forth in the applicable rules.
3. Service of any further subpoena can be directed to ███████████s via its Delaware-based registered agent. You may direct a courtesy copy to me via email.
4. Once we see and can consider the scope of the documents sought by any further subpoena we can confer about timing.

Thanks,

Mike

MICHAEL W. M<sup>c</sup>DERMOTT, ESQ.

## BERGER | HARRIS

1105 North Market Street, 11th Floor
Wilmington, DE 19801
phone: 302 | 655 | 1140 x 222
fax: 302 | 655 | 1131
mmcdermott@bergerharris.com
www.bergerharris.com

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.

**From:** Katie Smith [mailto:Katie.Smith@millermartin.com]
**Sent:** Tuesday, October 02, 2018 5:14 PM
**To:** Michael Mc Dermott
**Cc:** Richard Rose; Michael Dumitru
**Subject:** ███████████ [M&M-content.26970.0006]

Mr. McDermott,

Attached please find correspondence from Richard Rose regarding the above stated matter.

If you have any questions, please do not hesitate to contact us.

Thank you.

Katie Smith
Paralegal

5

**d** (423) 785-8333
**f** (423) 785-8480
Volunteer Building Suite 1200 | 832 Georgia Avenue | Chattanooga, TN 37402



CONFIDENTIALITY NOTICE
The information contained in this e-mail message is legally privileged and confidential, and is intended only for
addresses. If you are not the intended recipient, please be aware that any dissemination, distribution or copy of
prohibited. If you have received this e-mail in error, please immediately notify us by reply e-mail and delete this me
attachments. Thank you.

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
Knoxville Division

GLASSWALL, LLC,

     Plaintiff,

CASE NO. 3:17-CV-332

v.

AGC FLAT GLASS NORTH AMERICA,
INC. and POMA GLASS & SPECIALTY
WINDOWS, INC.,

Judge Mattice
Magistrate Judge Shirley

     Defendants.

_____/

## SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 7

     Plaintiff, GLASSWALL, LLC, by and through its undersigned counsel, and pursuant to

Fed. R. Civ. P. 33, hereby provides its supplemental response to Defendants, AGC FLAT

GLASS NORTH AMERICA, INC. and POMA GLASS & SPECIALTY WINDOWS, INC.,

*Interrogatory #7.*

                    **JESSE DEAN-KLUGER, P.A.**
                    *Counsel for Plaintiff*
                    1550 Biscayne Boulevard, 2nd Floor
                    Miami, Florida 33132
                    Phone: (305) 534-3460
                    Fax: (786) 206-3075


            By: ___/s/ Jesse Dean-Kluger_____
                    **JESSE DEAN-KLUGER**
                    Fla. Bar No. 0062201

1

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been served on the following by email and by mailing a copy thereof to them by first class mail, in an envelope addressed as follows, and by email, this 18th day of December, 2017:

> Richard C. Rose, Esq.
> Michael J. Dumitru, Esq.
> Miller & Martin PLLC
> Suite 1200
> 832 Georgia Avenue
> Chattanooga, Tennessee 37402

> By: /s/Jesse Dean-Kluger

2

**SUPPLEMENTAL ANSWER:**   Plaintiff is not claiming out-of-business damages. Plaintiff is not seeking legal fees incurred in connection with the prosecution of this claim.  Plaintiff is claiming the following damages:

1.    Legal fees incurred in defending against claims by Monadnock and Westchester Fire Insurance Company, claims which resulted from Defendants' inability to supply conforming product in a timely manner. Plaintiff has previously produced copies of statements from law firms relating to this element of damages.  In addition, plaintiff is hereby producing copies of additional statements relating to this claim.

In addition, plaintiff is seeking damages for the court reporter and American Arbitration Association fees incurred in connection with the arbitration. Copies of invoices from U.S. Legal Support and American Arbitration Association relating to these expenses have already been produced.

2.    Plaintiff's total out-of-pocket expenditures to complete the HPS job in comparison to the projected costs had Defendants been able to deliver conforming product on time.  Plaintiff has previously produced the Greyhawk "Claim for Production Impact" dated October 6, 2015, which identifies damages in the amount of $2,592,806.00.  In addition, plaintiff previously produced a budget for Hunters Point South, Buildings A and B (Murphy Depo., Ex. 2), which listed anticipated costs in the amount of $11,959,803.00.  Plaintiff also produced a Final Cost Report as of June 15, 2016 for the Hunters Point Project (Murphy Depo., Ex. 3), indicating that the total actual costs were in the amount of $18,518,225.36.  Plaintiff is claiming damages in the amount

3

of $2,842,258.18 representing the difference between the budget and the actual costs attributable to AGC failure to perform, as modified by the attached statement The Greyhawk damages are included within the damages referred to immediately above.

3.   The Arbitration Award - Monadnock was awarded $1,499,255.18 in the New York arbitration.   This Award has since been confirmed by Order of the United States District Court for the Eastern District of New York.   A copy of the Order confirming the Award has been produced.   In light of Monadnock's assignment of this judgment to ▆▆▆ ▆▆▆▆▆▆▆▆▆▆ (a copy of which has been produced), Glasswall is reducing this claim to ▆▆▆▆▆▆▆ – the amount paid by Glasswall to Monadnock.

4.   Interest on the Arbitration Award and Pre-Judgment Interest on the other elements of damages claims. The computation for the Arbitration Award interest has been explained in the August 1, 2018 e-mail of Jesse Dean-Kluger, Esq.   In addition, plaintiff is seeking pre-judgment interest on whatever damages are awarded in this matter from the date of the breach (as determined by the trier of fact) to the date of entry of judgment.

5.   Legal fees and damages which may be awarded against plaintiff in the Eastern District of New York.   Plaintiff cannot quantify this element of damages as the Eastern District of New York matter is currently pending.   Plaintiff seeks to recover any damages and legal fees which may be awarded to Westchester Fire Insurance Company on its third-party complaint against plaintiff.

4

GLASSWALL, LLC

Name: _Art Murphy_
Title: _VP_

**STATE OF FLORIDA** (
                    (
**COUNTY OF** Miami Dade (

    **BEFORE ME,** the undersigned, this _15_ day of _November,_ 2018 personally appeared _Arthur Murphy,_ who is personally known to me (✓) or who has produced a _____ with identification number _____ as identification and who did take an oath that the information furnished as incorporated in the foregoing Interrogatories is true and correct.



_____
**Notary Public**

Sworn and subscribed or affirmed before me this _15_ day of _November_ 2018.

**SEAL**

> ELDA ELISA BROUWER
> Notary Public - State of Florida
> Commission # FF 226489
> My Comm. Expires Aug 27, 2019
> Bonded through National Notary Assn.

5

| Budget sheet Line Items | Budget | Actual Costs sheet line items | Actual | Budget Minus Actual | % Attributal to AGC | Total Attributed to AGC |
|---|---|---|---|---|---|---|
| General Management: | | General Management: | | | | 0.00 |
| 1000 Overhead allocation | 1,125,250.00 | 1000 Overhead | 223,377.00 | 901,873.00 | 0.0% | 0.00 |
| | 1,050,250.00 | 1105/1110 Postage / Courier | 13,544.63 | 1,036,705.00 | 0.0% | 0.00 |
| | | 1350 Customs | 13,739.00 | -13,739.00 | 0.0% | 0.00 |
| 1400 Bond | 65,000.00 | 1400 Bond | 1,094.00 | -1,094.00 | 0.0% | 0.00 |
| 1500 Travel | 10,000.00 | | 195,000.00 | -130,000.00 | 0.0% | 0.00 |
| | | | | 10,000.00 | | 0.00 |
| | | | | | | 0.00 |
| Engineering | | Engineering: | | | | 0.00 |
| 2000 Payroll | 200,000.00 | 2000 Payroll | 1,003,463.00 | -809,463.00 | 6.0% | -48,207.78 |
| | 200,000.00 | 2010 P/R Benefits - Taxes | 667,905.00 | -467,905.00 | | 0.00 |
| | | 2900 Testing & Eng | 59,155.00 | -59,155.00 | | 0.00 |
| | | 2950 Consulting / Prof fees | 45,260.00 | -45,260.00 | | 0.00 |
| | | 2990 Travel | 230,044.00 | -230,044.00 | | 0.00 |
| | | | 1,098.00 | -1,098.00 | | 0.00 |
| | | | | | | 0.00 |
| Materials: | 8,464,300.00 | Materials: | 11,925,308.00 | -3,457,008.00 | 0.0% | 0.00 |
| 3000 thru 3921 (exclude 3100) | 1,312,926.00 | 3000 thru 3921 (exclude 3100) | 9,189,419.00 | -7,876,493.00 | | 0.00 |
| 3100 Glass | 2,304,100.00 | 3100 Glass | 2,735,880.00 | -431,789.00 | 100.0% | -435,789.00 |
| | | | | | | 0.00 |
| Manufacturing: | 1,033,575.00 | Manufacturing: | 4,847,708.00 | -3,794,130.00 | 31.0% | -1,176,180.30 |
| 4000 Payroll | 896,156.00 | 4000 GW P/R Assbly / Glzg | 465,389.00 | 433,767.00 | -40.0% | -173,506.80 |
| | | 4001 GW P/R Fabrication | 359,563.00 | -359,563.00 | | 0.00 |
| | | 4005 GW P/R Benefits & Taxes | 136,716.00 | -136,716.00 | 40.0% | -54,686.40 |
| | | 4083 GW P/R GC | 98,399.00 | -98,399.00 | 50.0% | -49,199.50 |
| | | 4084 GW P/R Production | 167,212.00 | -167,212.00 | | 0.00 |
| 4140 Payroll Packaging | 154,417.00 | | | 154,417.00 | | 0.00 |
| | | 4150 GW P/R Ship & Rec | 198,051.00 | -198,051.00 | 40.0% | -79,220.40 |
| | | 4155 Material Frt | 838,372.00 | -838,372.00 | | 0.00 |
| | | 4180 Assbly/Glz O/S Labor | 1,832,037.00 | -1,832,037.00 | 40.0% | -732,814.80 |
| | | 4185 Fab O/S Labor | 600,331.00 | -600,331.00 | | 0.00 |
| | | 4190 Other Ship/Rec O/S Labor | 231,633.00 | -231,633.00 | 40.0% | -92,653.20 |
| | | | | | | 0.00 |
| Installation: | 700,000.00 | Installation: | 1,425.00 | 698,575.00 | 0.0% | 0.00 |
| | 700,000.00 | 4200 GW Payroll Field | 1,425.00 | -1,425.00 | | 0.00 |
| | | | | 700,000.00 | | 0.00 |
| 4266 Glasswall deliveries | | | | | | 0.00 |
| | | | | | | 0.00 |
| Bid - Bidding | 1,680.00 | | | 1,680.00 | 0.0% | 0.00 |
| 6950 Travel | 1,680.00 | | | 1,680.00 | | 0.00 |
| | | | | | | 0.00 |
| Project Management | 225,000.00 | Project Management: | 234,700.00 | -11,700.00 | 0.0% | 0.00 |
| 7000 Payroll Proj Mgmt | 220,000.00 | 7000 GW P/R Proj Mgmt | 74,465.00 | 45,505.00 | | 0.00 |
| | | 7005 P/R Benefits & taxes | 6,191.00 | 6,191.00 | | 0.00 |
| 7050 Travel | 30,000.00 | 7050 Travel | 149,467.00 | -119,467.00 | | 0.00 |
| 7055 Meals & Ent | 18,000.00 | 7055 Meals & Ent | 4,547.00 | 13,453.00 | | 0.00 |
| 7060 Contingencies | 55,000.00 | | | 55,000.00 | | 0.00 |
| | | | | | | 0.00 |
| Markup | 188,000.00 | Markup | 292,049.00 | -94,049.00 | 0.0% | 0.00 |
| 8000 Payroll | 25,000.00 | 8000 GW P/R Reps | 33,843.00 | -8,843.00 | | 0.00 |
| | | 8001 GW P/R Reps | 4,169.00 | -4,169.00 | | 0.00 |
| | | 8050 Travel | 333.00 | -333.00 | | 0.00 |
| | | 8055 Meals & Ent | 316.00 | -316.00 | | 0.00 |
| | | 8060 Misc | 2,046.00 | -2,046.00 | | 0.00 |
| 8070 Materials | 78,000.00 | 8070 Materials | 157,620.00 | -79,620.00 | | 0.00 |
| 8075 Lab fees | 620,000.00 | 8075 Lab fees | 76,022.00 | -58,022.00 | | 0.00 |
| 8080 Install Labor | 55,000.00 | 8080 Install Labor | 5,700.00 | 29,300.00 | | 0.00 |

Total Costs
Contract Value
Profit